UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

BILLY SCHUMANN, an individual, and
DUSTIN ABRAHAM, an individual, ON
BEHALF OF THEMSELVES AND OTHERS
SIMILARLY SITUATED,

       Plaintiffs,

v.                                 Case No. 2:12-cv-00347-JES-CM

COLLIER ANESTHESIA, P.A., a Florida
corporation, WOLFORD COLLEGE, LLC, a
Florida limited liability company, THOMAS L.
COOK, an individual, and LYNDA M.
WATERHOUSE, an individual,

       Defendants.

_____/

## DEFENDANTS' MOTION FOR DECERTIFICATION OF COLLECTIVE ACTION

Defendants Wolford College LLC, Thomas L. Cook and Lynda M. Waterhouse, joined by Defendant Collier Anesthesia, P.A. ("CAPA") (collectively as "Defendants"), respectfully move for decertification of this case as a collective action on the grounds set forth.

## PROCEDURAL BACKGROUND

### A.    The Complaint

1.      On June 29, 2012, Plaintiffs filed their proposed collective action alleging that they were employees, not students, during their tenure at Defendant Wolford and during the entire time period they were gaining legally mandated clinical experience at locations staffed by Defendant CAPA and other anesthesiology groups.  (Dkt. 1.)

2.      This is a FLSA suit brought by two registered nurses, Schumann and Abraham (collectively, "Plaintiffs"), who are former students of Defendant Wolford College that were engaged in a course of study leading to a Master of Science in Nurse Anesthesia and ultimately,

passage of a Board exam and certification as a Certified Registered Nurse Anesthetist ("CRNA").

3.       While students, Plaintiffs claim to have performed the work of CRNAs. (Complaint ¶ 14.)  While allegedly performing this work, Plaintiffs, of course, admittedly did not have a degree, nor had they passed the Board exam, required to allow them to work as CRNAs. (Complaint ¶ 19.)  Their claim is limited by their clinical experience at sites staffed by Defendant CAPA and does not include their experience at other sites.

4.       On August 20, 2012, the Court entered its Scheduling Order.  (Dkt. 35.)  In it, the Court required Plaintiffs, as well as any individual that opted-in to the case prior to dissemination of a court-approved opt-in notice, to respond to the Court's Interrogatories, as well as produce "all documents in Plaintiff's possession, custody or control that pertain to the unpaid wages claimed in the Complaint."  (Dkt. 35 at ¶¶1-3.)  At this point in time, Plaintiffs, plus 12 other former students (hereinafter, "pre-Notice Opt-Ins"), had joined the lawsuit.[1]

**B.       Conditional Certification and Lack of Interest**

5.       Also on August 20, 2012, Plaintiffs filed their Motion to Conditionally Certify Collective Action and to Facilitate Notice.  (Dkt. 28.)  The Court granted Plaintiffs' Certification Motion on February 21, 2013.  (Dkt. 91.)  In its Order, the Court held: "Individuals who timely opt into this collective action pursuant to this Court's supervised notice procedure shall be deemed joined as opt-in plaintiffs for all purposes under the Federal Rules of Civil Procedure and under the orders of this Court through trial and appeal, if any, subject to any motion for decertification or representative discovery …"  (Dkt. 91 at ¶6.)  Importantly, the Court also

---

[1] Dustin Abraham (Dkt. 2), Denise Arminio (Dkt. 9), Stephanie Benjamin (Dkt. 8), Ofelia Biagan (Dkt. 23), Christopher Bourn (Dkt. 11), Lannette Gibson (Dkt. 20), Jeanine Hakenewert (Dkt. 7), Lahoma Nachtrab (Dkt. 15), Ricardo Rosado (Dkt. 19), Billy Schumann (Dkt. 2), Lauren Tidwell (Dkt. 6), Celine Vidaurri (Dkt. 10), Christina Vinas (Dkt. 27), and Derek White (Dkt. 12).

explicitly acknowledged that individualized inquiries would be "required" at the second stage of

the proceedings where this case currently lies.  (Dkt. 91 at fn. 2 (stating, "Defendant's argument

that individualized inquiry is required is better suited at the decertification stage when additional

information is available regarding the characteristics of the opt-in plaintiffs."  *See, e.g.,*

*Vondriska v. Premier Mortg. Funding, Inc.*, 564 F. Supp. 2d 1330 (M.D. Fla. 2007).")).

6.      The 90 day opt-in period began on April 16, 2013 (Dkt. 101) and ended on

July 15, 2013.  There were 16 plaintiffs and Opt-Ins as of April 16.[2]  Throughout the entire 90-

day opt-in period, only nine additional former students opted-in to the lawsuit, for a total of 25

out of 273 potential class members.

7.      Despite the Court's Order (Dkt. 91), Plaintiffs have repeatedly objected to and

attempted to resist discovery as to Opt-Ins, claiming that individualized discovery is

inappropriate.  To date, a ten deposition limit has been in effect and Defendants deposed the two

Plaintiffs and five Opt-Ins amongst their ten available depositions.  Plaintiffs have opposed any

enlargement of the ten deposition limit and also oppose any identification of their trial witnesses

from the group of Plaintiffs and Opt-Ins for purposes of allowing depositions.  (Dkt. 164.)

8.      There is a dispositive motion for summary judgment by Defendants pending on

the ground, *inter alia*, that the activities in issue were clearly within the legally mandated

curriculum of a Master's program in an accredited College for which Plaintiffs received

academic credit and eligibility to graduate and qualify for the national certification exam and

thus, the activities were not employment under the FLSA.  (Dkt. 174.)

9.      Defendants respectfully submit that the Motion for Summary Judgment should be

granted.  The only similarity among these Plaintiffs/Opt-Ins is that they were not employees of

---

[2]  In addition to those individuals identified above in footnote 2, the following individuals had also joined pre-notice:
Daniel Penton (Dkt. 43) and Sheila Smith (Dkt. 36).

any of the Defendants. Instead, they were all students enrolled at an accredited College who seek to be paid for the legally required clinical component of their education which allowed them to (a) graduate with a Master's degree, and (b) sit for the national exam leading to certification as a CRNA, which (c) led to a substantial increase in salary.[3] This Motion specifically addresses why, in addition to the dispositive fact that they were not employees, the students' claims should not proceed to trial as a collective action.

## MEMORANDUM OF LAW[4]

This Court earlier conditionally certified this case as a collective action for notice purposes, finding that it met the "fairly lenient" standard to allow for notice to alleged similarly situated persons (Doc. 101.) The Court indicated that whether individualized inquiries would be required making certification inappropriate was better suited for a determination on motion for decertification. In *Whineglass v. Smith*, 2013 U.S. Dist. LEXIS 71977 (M.D. Fla. May 3, 2013), the Court discussed the standard for decertification of an FLSA collective action in the Eleventh Circuit as follows:

> However, at the current stage, which was prompted by the defendants' motion for decertification, "the plaintiff[s] bear[] a heavier burden." *Morgan v. Family Dollar Stores. Inc.*, *supra*, 551 F.3d at 1261. Thus, the standard to show substantial similarity is more stringent because the court "has a much thicker record than it had at the notice stage, and can therefore make a more informed factual determination of similarity." *Id.*
>
> Three factors that aid in determining similarity at the decertification stage are (1) disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to defendants that appear to be individual to each plaintiff; and (3) fairness and procedural considerations. *Id.* "[L]ogically, the

---

[3] For example, Plaintiff Abraham's salary increased from $73,000/year to $250,000/year. (Abraham at 12-13, 25-27.) Plaintiff Schumann's increased from approximately $61,000/year to $160,000-$170,000/year. (Schumann at 19-20, 33-34.)

[4] The testimony and exhibits cited in this Motion have already been filed in the record in support of Defendants' Motion for Summary Judgment (Dkt. 174, *et. seq.* (Index documents)). Rather than re-file the voluminous record, Defendants refer to and incorporate the testimony and exhibits found at Dkt. 174 and the Index related to it. Any exhibits not already included in the record at Dkt. 174, *et. seq.*, are filed concurrently herewith.

more material distinctions revealed by the evidence, the more likely the district court is to decertify the collective action." *Anderson v. Cagle's, Inc.*, 488 F.3d 945, 953 (11th Cir. 2007), *cert. denied*, 553 U.S. 1093, 128 S. Ct. 2902, 171 L. Ed. 2d 841 (2008).  Furthermore, the Eleventh Circuit cautioned:

> [A]lthough the FLSA does not require ... class members to hold identical positions .... the similarities necessary to maintain a collective action under §216(b) must extend beyond the mere facts of job duties and pay provisions .... Otherwise, it is doubtful that §216(b) would further the interests of judicial economy, and it would undoubtedly present a ready opportunity for abuse.

*Id.* (quotations and citations omitted).

If it is determined at this stage that the named plaintiff and the opt-in plaintiffs are not similarly situated, the district court decertifies the collective action; the opt-in plaintiffs are then dismissed without prejudice; and the original named plaintiff continues to trial on his original claim.  *Hipp v. Liberty Nat. Life Ins. Co.*, *supra*, 252 F.3d at 1218.

*Id.* at *15-16.

## A.    Disparate Settings

### 1.    Disparate and Confusing Characterizations Regarding Claims Which Should Be Dismissed

Plaintiffs will argue that they and the Opt-Ins are "similarly situated" because they were all in the same alleged "job" (students in the same Masters degree program of Wolford College who participated in clinical activities at sites staffed by CAPA) with the same "pay" (none, but they claim that their student activities constitute "employment" under a six-factor DOL test and/or the economic realities test).  As held in *Anderson v. Cagles, Inc., supra*, "the similarities necessary to maintain a collective action under § 216(b) must extend 'beyond the mere facts of job duties and pay provisions'" and "the more material distinction revealed by the evidence, the more likely the district court is to decertify the collective action."

The issue of whether Plaintiffs and Opt-Ins were "employees" is before the Court on motion for summary judgment and is relevant at the second stage analysis to examine the

different factual considerations as to their claims should they be permitted to proceed.  As

recognized in *DeMauro v. The Limo, Inc.*, 2011 U.S. Dist. LEXIS 1229 (M.D. Fla. Jan. 3, 2011),

although each Plaintiff and Opt-In may have the same position, the economic realities test to

determine whether they were "employees" is fact intensive and requires individualized analysis

and would not be appropriate for determination on a class-wide basis.

In issue here are the disparate and confusing bases within the student activities that

should be determined on motion for summary judgment to not be employment upon which the

Plaintiff and Opt-Ins contend that they are "employees":

a.      **Non-Representative Plaintiff Abraham – Claim that Employment Is
        Where Case Supervision Was Not One-to-One**

Plaintiff Abraham admitted that he was learning while in the clinical curriculum

(Abraham at 93) including by observing, being talked through procedures by doctors and

CRNA's and "hopefully" progressing (Abraham at 99-102).  He was anxious and nervous and

needed help to complete procedures (Abraham 107-108).  He improved with practice (Abraham

113-114).

Abraham admitted that the anesthesia cases that he performed were "educational" and

were required to graduate under standards mandated by the certification board (Abraham 159).

Abraham's claim relates to his training at clinical sites in Naples, but not St. Mary's (Abraham

174).  In his Court complaint and filed declaration, he claims to have done the work of CRNA's

while he was a student.  When asked about how the required student educational cases could be

accomplished without doing the work of a CRNA, he testified that the student caseload could be

accomplished by one-to-one supervision of a student by a CRNA (Abraham 86).  He testified:

> Q  . . . Your complaint is all of your cases should have been completed at
> a one-to-one ratio?
>
> A  Correct.

Q  So if you did have a day where a M.D. stayed with you -- or CRNA stayed with you from induction, maintenance and emergence, all the way through, that case, you do not believe, was work, that was a clinical ·experience; is that accurate?

A  Correct.

(Abraham 88).

He claimed that when he was supervised at the ratio of two students to the teacher (approved as proper by COA, the National Accreditation Authority), he became a worker (Abraham 92-93).  He explained that he is not suing over his clinical training at St. Mary's where supervision was one-to-one from July 24, 2011 to September 18, 2011 (Abraham at 174, 178). He is also not suing over his clinical experience in Davenport in Tampa from October 2011- February 2012 where his clinical experience was similar to Naples, but he could not explain why he was not including that time in his claim (Abraham 170-172).  Abraham also claims that he was an employee of CAPA but not Wolford College (Abraham 53).

**b.   Opt-In Gibson's Contrasting Claim With All Cases Conceded As Educational**

In contrast, Opt-In Lanette Gibson testified:

Q  And let's just start for a second with that one to two supervision ratio.· Do you have complaints about the ratio itself?

A  **No.**

Q  Did you like having some degree of autonomy and responsibility?

A  **Yes.**

(Gibson 118).  Gibson further testified:

Q  . . . Is what you certified to the NBCRNA as your clinical education transcript, were those – those duties that are on this exhibit educational in nature?

                    *   *   *

A  The duties that are on this sheet, yes, are educational in nature.

7

*   *   *

> Q   And were you expecting anybody to -- to pay you during the time you were a student?
>
> A   No.

(Gibson 62-64).

Clearly, Abraham is not representative of Gibson.  Gibson further testified that she rated Wolford as "excellent" in preparing her to become a safe and confident CRNA, in the variety of the clinical caseload, in clinical supervision, in willingness of clinical faculty to assist when she asked for help, and for the overall clinical program (Gibson 64-66).  Gibson claimed that her "work" as an "employee" was setting up rooms, stocking anesthesia carts and pre-op'ing patients pre-op in cases to which she was not assigned (Gibson 60-63).

### c.   Plaintiff Schumann's Varying Claim

Plaintiff Schumann's claim is also contradictory:

> Q   But you consider the time period when you were on a one-to-one supervision ratio also to be work, correct?
>
> A   Yep.
>
> Q   So unlike Mr. Abraham . . . the supervision ratio isn't what you based the concept of work on?
>
>     *   *   *
>
> THE WITNESS:   No.

(Schumann 148)

Schumann in contrast to Abraham and Gibson claims that all of his anesthesia cases certified to national certification board as his required education were "work":

> Q   So . . . what was a requirement to receive your master's and sit for the boards, you're concurrently wanting to be paid for, right?
>
> A   I believe that my education was always second to the staffing needs of Collier Anesthesia. . . .

8

Q   And you're asking to be paid for those cases that you counted and
certified to the board, right?

A   Absolutely.

(Schumann 151)

### d.   Opt-In Biagan's Greatly Differing Claim

Biagan requested and was placed in Tampa for her clinical experience (Biagan at 79,

Exh. 2).  There, she was supervised by professionals from North Tampa Anesthesia Consultants

not Defendant CAPA (Biagan at 80).  She describes her clinical experience in Tampa as

"horrible, to say the least" (Biagan at 80).  Her clinical experience in Tampa is not a part of her

FLSA claim in this case.

On March 29, 2010, Defendant Wolford issued Biagan an administrative warning

requiring her to return to the Naples hub due to poor clinical evaluations in Tampa (Biagan at 85-

87, Exh. 13).  In Naples, there was "more structure to my learning," and she even spent time with

Dean J. Nolan learning how to operate the anesthesia machine (Biagan at 84).  Biagan describes

her assignment as "a breath of fresh air" because she "had the pleasure of being instructed by Dr.

Thomas Cook doing intubation, and to this day I am very grateful for it" (Biagan at 88-89).

Biagan learned from Dr. Cook, and she "most definitely" felt that she learned more in Naples as

compared to Tampa (Biagan at 89).  When asked about the difference, Biagan testified:

> There was more structure.  You're really encouraged to read up more
> before each case, be ready with - be ready with answering questions
> about what specific anesthesia you would use for this particular case and,
> you know, care plans, primarily.

(Biagan at 90).  By "answering questions," Biagan testified that the CRNA and MDA would quiz

her while she was at the clinical site which she found to be helpful (Biagan at 90).

On September 2, 2010, Defendant Wolford suspended Biagan.  (Biagan at 118-19, Exh.

20).  The next day, Biagan sent an e-mail which she testified was truthful to Dean Nolan, Corder

and Ortega clarifying that she "LOVE[s]" working with Drs. Arrigo, Statfeld and M. Nolan because "they tell me what I need to do" (Biagan at 123-24, Exh. 21). She continued that "I appreciate their candor; they simply want me to be better. Their best trait is their authenticity. I trust their judgment because of their maturity and years of teaching with Wolford and working in Anesthesia in general. I learned so much from them and can truthfully say 1 enjoy working with them" (Biagan at 124, Exh. 21). Defendant Wolford ultimately dismissed her effective September 13, 2010 "due to your lack of clinical progress and failure to perform safely in the clinical area" (Biagan at 124, Exh. 22).

An example of Biagan's clinical incompetence was that in a hysterectomy operation, upon visualization of the uterus, she asked the surgeon if it was the heart. (Dkt. 174, *et. seq.*, Ortega Dec. Exh. 6.) Further, every day was like her first day and multiple CRNA's worked with one-to-one but could not help her improve. *Id.*

Nevertheless, Biagan also claims that she deserves wages for her work and testified:

Q . . . Had you ever administered anesthesia to a patient prior to your enrollment at Wolford College?

A No.

Q So were you learning to do those things while at Wolford College?

A Yes.

Q And did you learn procedures and anesthesia techniques for the first time during your tenure at Wolford College?

A Yes.

Q But you also believe that time while you were learning you should be compensated for?

A Um, yes, because I – yes.

Q Why?

A   Because I, um – I saw it and I experienced that I was working over and beyond the required number of hours as a student.

Q   What's the required number of hours as a student?

A   Um, 45 -- around 45 hours, 40 hours.

Q   What do you base that on?

A   Um, five days a week and eight hours at most.

(Biagan 132-33)

The balance of The Students that were deposed were equally disparate in their explanation of the purported claim.  Should Plaintiffs' action survive summary judgment in any respect, the evidence of a practice of treating Master's degree students as students, not "employees," is insufficient for certification given the varying and confusing characterizations of Plaintiffs and Opt-Ins.  As shown above, allowing supposed representative proof would be unduly prejudiced and violate due process.

As further example, Abraham erroneously claims that anesthesia cases where he was supervised by a CRNA supervising two students (as approved in COA accreditation standards and the Center for Medicare and Medicaid Services) are a claim of work, but Gibson correctly testifies that they are "educational," as were all of her anesthesia cases.  To Schumann, however, all the student clinical cases are supposedly work, while to Gibson it was setting rooms, stocking and patient pre-op that was work, even though she admits that she had to learn these duties to become a CRNA.  To Biagan, although she loved her education in Naples, she is entitled to compensation from it because it took more than 40 hours per week, despite her incompetent performance leading to dismissal.

In *Epps v. Oak Street Mortgage LLC*, 2006 U.S. Dist. Lexis 31896 (M.D. Fla. May 22, 2006), approving Case No. 5:04-cv-46-0C-10GRJ (M.D. Fla. Nov. 14, 2005), the plaintiffs

argued that a collective action was appropriate regarding a claim of an illegal overtime policy and practice against recording more than 40 hours.  However, like here, the testimony of the plaintiffs and opt-ins who were deposed was confused ranging from (a) being told to not record more than 40 hours, to (b) having time sheets returned reflecting more than 40 hours, to (c) an implied policy, to (d) being paid overtime for more than 40 hours.  The Court ruled that such claims would have to be determined on an individual basis in granting decertification.

### 2.     Individual Analysis is Required to Determine Nature of Alleged Work

In addition, the Court would have to apply the economic realities test to determine "employment" if any matter here survives summary judgment, which requires an individualized examination of all the circumstances surrounding the activity.  *Kaplan v. Code Blue Billing & Coding, Inc.*, 504 Fed. Appx. 831 (11th Cir. 2013) (economic realities test applies); *Freeman v. Key Largo Volunteer Fire & Rescue Dept., Inc.*, 494 Fed. Appx. 940 (11th Cir. 2012) ("the 'economic reality' of all the circumstances surrounding the activity"); *Blair v. Wills*, 420 F.3d 823 (8th Cir. 2005) ("totality of the economic circumstances").  The Court would next have to determine what, if any, compensable activity was performed by each, including where, when, how long, *etc.*

If their claims are not dismissed on summary judgment, an individualized analysis of their claims would be required as to every student as to what, if anything, remains in issue, which could include, if the matter is not dismissed in its entirety, any of the following:

1.     The individual's schedule and clinical location and whether it was Naples/CAPA-related – The claims in this case pertain only to clinical experience in Naples in CAPA serviced facilities.  As shown above, for example, Abraham had training in Tampa and at St. Mary's which are not a part of his claim.  Biagan also trained incompetently in Tampa.

12

2.      The individual's clinical rotation and experience – students rotate through numerous different medical facilities so as to learn different anesthesia procedures for different surgical procedures.  Clinical experience of Plaintiffs and Opt-Ins differs greatly.  For example, amongst the Pre-Notice Opt-Ins and Plaintiffs:

|                        | **Low** | **High** |
|------------------------|---------|----------|
| Total Anesthesia Cases | 656     | 1034     |
| Geriatric              | 254     | 469      |
| Pediatric              | 25      | 60       |
| Trauma/Emergency       | 30      | 118      |
| Outpatient             | 158     | 386      |
| Obstetrical            | 44      | 91       |

*See* Dkt. 174, *et. seq.*, Ortega Dec. Exh. 2.

3.      Daily assignment and activities – This requires an analysis of the medical center to which they were assigned, the anesthesia cases available at the time, and their daily activities. This would further include an analysis of time being verbally instructed on procedures, being quizzed, and studying.

4.      The degree to which the individual was merely observing, watching or shadowing.

5.      Whether the individual performed part of a procedure or activity and, if so, what part and why.

6.      The individual's level of competence at various points and whether it was deficient or competent and how that affected their responsibilities– for example, Biagan claims wages for visualizing a uterus as a heart and her lack of competence restricted her activities.

7.      What supervision was present for each clinical case - was it 1-to-1 or 2-to-1 teacher-to-student supervision; were they being talked through the procedure; did the supervisor have to step in, *etc.*

8.      The educational value and how they benefitted as a student.

9.      Whether the individual swore under penalties of perjury that the activity being claimed as "employment" was education when applying for certification.

10.     How each described their clinical education in their self-evaluation and other documents.

11.     Whether activities alleged as work were *de minimis.*

12.     Whether the time for activities that they recorded and swore-to as "a complete and accurate record" was accurate.

13.     Whether they allegedly "worked" during any unrecorded time period.

14.     Whether they can prove that any Defendant benefitted from their activity and, if so, how.

*Keef v. M.A. Mortenson Co.*, 2009 U.S. Dist. LEXIS 14358 (D. Minn. Feb. 24, 2009), bears a number of similarities to this case in regard to the appropriateness of granting decertification.  There, the issue was whether employees were wrongly classified as exempt under the FLSA.  The court granted conditional certification to provide an opportunity to determine whether employees were interested in pursuing the claim.  There were a total of 10 opt-ins out of a group of 312 – similar to the 9 opt-ins following notice to a group of almost 300 in this case.  Like here, the plaintiffs argued that the misclassification of their common job was a sufficient issue for certification, but the court found that this "simple formula does not, however, resolve the issue."  The court found that it must inquire into day-to-day activities and

14

responsibilities.  The court found that the plaintiffs worked in different groups or on different

projects within a group with some performing well and having the opportunity to use their

discretion and others performing less well and receiving less significant work.  The court held

that the plaintiffs did not meet their burden of showing that a collective action was appropriate.

The issues for trial were highly individualized.  The court also noted "the potential class

members' underwhelming enthusiasm for this action" and held:

> In view of the fact-intensive inquiry required for each plaintiff, and the
> limited number of potential plaintiffs who have chosen to opt-in, the
> Court exercises its discretion and concludes an FLSA collective action is
> inappropriate.

*Id.* at 8.

**B.     Individualized Defenses Available to Defendants**

Defendants will have individualized defense as to what Plaintiffs and Opt-Ins claim as

work.  In *Epps, supra,* individualized defenses existed to contest the alleged work, including

when it occurred, whether plaintiffs took advantage of the time-keeping system, and whether the

activity was *de minimis.*  Accordingly, decertification was granted by this Court.  *See also*

*Whineglass, supra* (decertification warranted by individualized defenses), *Briggins v. Elwood*

*Tri, Inc.,* 882 F. Supp.2d 1256 (N.D. Ala. 2012) (decertification where if a court could review a

list of tasks allegedly performed and attempt to schedule a trial to determine if some task

constitutes work, it would still have to conduct an inquiry into who performed what and where

and for how long and also would have to review *de minimis* activities with an individual inquiry

as to each Plaintiff or Opt-In as to the aggregate time and whether done daily or sporadically);

*King v. W. Corp.,* 2006 U.S. Dist. LEXIS 3926 (D. Neb. Jan. 13, 2006) (decertification where

case required individualized examination of alleged work, scheduling of employee, off-the-clock

work and *de minimis* work).

1.      **Credibility Defenses On Contradictory Allegations**

Should the matter not be disposed of by summary judgment in some respect, Defendants

will seek to present individualized evidence against each Opt-In's claim and the record reflects

that it is not possible for Plaintiffs to establish the claims through common testimony.  As held in

*Aquilino v. Home Depot, U.S.A., Inc.*, 2011 U.S. Dist. LEXIS 15759, *27-28 (D.N.J. Feb. 15,

2011), in holding that potential defenses would make collective treatment unmanageable.

> In addition, Defendant is entitled to impeach the credibility of individual
> Opt-Ins by bringing to light misrepresentations about duties that they
> may have made on their resumes.  Further, Defendants may also try to
> impeach the credibility of individual Opt-Ins by questioning those Opt-
> Ins about contradictory responses given when providing declarations,
> interrogatory answers, and deposition testimony.  Such individual
> questioning would likely make it difficult and confusing for the fact
> finder to make both credibility determinations and to discern whether
> each individual Opt-In is exempt under the FLSA. . . .

Here, a number of Opt-Ins earlier filed "cookie cutter" declarations which were virtually

word-for-word the same.  Depositions have shown that these declarations were largely a sham

and significantly contradicted by deposition testimony.  Also, the Plaintiffs and Opt-Ins prepared

self-evaluations while students, sharply contradicting their present claims.  In addition, there are

student disciplinary records and other records contradicting the claims.  *See Reyes v. Texas EZ*

*Pawn, L.P.,* 2007 U.S. Dist. LEXIS 1461 (S.D. Tex. Jan. 8, 2007) (decertification granted;

defendant may have to use employment records, including evaluations to rebut plaintiff's duty

allegations).

These **self**-evaluations are replete with admissions showing the sound educational nature

of their "learning" activities, as well as the diverse, dissimilar and individualized clinical

experiences.  For example, Plaintiffs and Opt-ins state:

**Schumann: "I was unfamiliar and unaware with the routine** . . . **I learned** that day to
utilize upper classmen by having one come demonstrate and **show me** the routine . . . I
**learned** to better prepare in the morning for all the day cases in order to prevent being

behind all day . . . I would like to **improve my intubations** with the me[t]al blades . . . I would like to **improve in my knowledge** about medications in the cast not just induction drugs. I have begun **studying** each drug individually . . . **I plan to continue to discuss medications with CRNAs**."

**Abraham:** "I am enjoying my **education** and I look forward to **learning** as much as I can in the last eight months here in Naples. It is hard to believe twenty months has gone by already."

**Tidwell:** "With everything, I think **practice makes perfect**. I need to put more effort into my **studies** and read up on regional techniques again. I feel very weak in this area. **Also, I think being alone in a room with a CRNA is very helpful to my growth**."

**Biagan:** "**I just feel that there is so much learning here. I'm growing every single day**, thanks to helpful, knowledgeable, and well-meaning people at Wolford & DSN **(esp. Dr. Cook ☺)**. . . . My goal someday is to be a safe clinician."

**Gibson:** "I want to continue to **learn everyday**! I will be open to **learning new and better ways** of performing skills, managing patients, etc. . . . **I am happy with my education I received at Wolford as I feel it has prepared me for employment at my new career**. Thank you!!!"

**Nachtrab:** "**Thinking of graduation is bitter sweet. . . .** I still have a healthy dose of fear. **I still have so much to learn**. It is unbelievable how far I and my classmates have come in such a short period of time. . . ."

**[Student 24]:** "I would like to **improve** upon everything . . . I want to perfect the emergence and **my plan for growth is to really pay attention to the surgery and where the surgeon is** . . . ."

**Vinas:** "My plan is to really **watch** my senior student and **obtain any advice possible from my anesthesiologist** . . . **I learned so much during my first semester of clinicals:**"

                                        *      *      *

"**This semester I had a huge learning curve**. I am less anxious and able to think and perform better."

(Dkt. 175, *et. seq.,* Ortega Dec. Exh. 7.)

####        2.       Disparate and Impeachable Time Claims

The students all regularly recorded their clinical time and submitted it under oath to the

national certification board. Some claim it was accurate, while others self-servingly may

belatedly seek to inflate it. Generally, all the sworn answers to the Court's interrogatories were

greatly inflated generalized estimates over what was recorded by Plaintiffs and Opt-Ins and

sworn-to to the national certification board.

As held in *Blakes v. Illinois Bell Telephone Co.*, 2013 U.S. Dist. LEXIS 176496, *60-61

(N.D. Ill. Dec. 17, 2013):

> Illinois Bell's argument that its credibility defenses preclude ongoing
> certification is also well-taken. According to Illinois Bell, decertification
> is appropriate because it has "ample cause for impeaching individual
> technicians through cross-examination," and it would be deprived of that
> opportunity if the case proceeds collectively. (R. 226, Def.'s Reply at
> 84.) . . . But here, there is no reason to think that any cable splicer could
> give truly representational testimony regarding the collective habits of
> cable splicers with respect to whether, when, why, and how they chose to
> manipulate their time records . . . . In these circumstances, to resolve
> whether cable splicers worked through lunch or otherwise hid time . . . a
> fact-finder would have to "pick the class apart, plaintiff by plaintiff,
> going into the day-to-day duties of each of the plaintiffs to prove their
> defenses."

In *Briggins v. Elwood Tri, Inc.*, 882 F. Supp.2d 1256, 1276 (N.D. Ala. March 29, 2012),

the court reached the same result in granting the motion to decertify:

> The defendants respond by arguing that contradictory evidence is
> appropriate for consideration at the decertification stage. See Def. Reply
> Br., at *12 n. 27 (citing Lugo, 737 F. Supp. 2d at 308). The court agrees
> with the defendants, to the extent that the court considers the
> contradictory evidence in deciding whether to decertify, and not in
> considering the merits of the plaintiffs' claims, Whether Mr. Curry's
> testimony is irreconcilable with or should be believed over his scan in
> times is, indeed, an issue for the jury. That the defendants would have to
> question and impeach individual plaintiffs, because no representative
> testimony exists as to the extent of a plaintiff's unpaid overtime, is a
> point the court must consider in deciding whether the plaintiffs are
> similarly situated and whether a collective action is proper in this case.
> *See Smith v. T-Mobile USA*, 2007 U.S. Dist. LEXIS 60729, at *21-23
> (explaining that at the decertification stage, the court would not view
> declarations offered by the defendant as disproving a plaintiff's
> allegations, but that it would consider the individualized nature of the
> defenses in considering whether the case should be decertified).

In order to be eligible to sit for Boards, a student must graduate from an accredited nurse

anesthesia program and complete a certain number and mix of anesthesia cases and procedures.

All of The Students that graduated submitted certifications to the NBCRNA which included a transcript of their academic coursework and clinical experience to prove they were qualified to sit for Boards.  (Dkt. 175, *et. seq.,* Ortega Dec. Exh. 2.)  Every Plaintiff/Opt-In, including The Students, certified:

> As of the date of my signature below, I have read this transcript and it is a complete and accurate record of my academic coursework and clinical experience in the above-named accredited nurse anesthesia program.

*Id.*  Some of the SRNA also certified: "I agree to disqualification from examination, to denial of certification, and to forfeiture and redelivery of any certificate granted me by said Council in the event that **any of the statements or answers made by me in this application are false** or in the even that I violate any of the rules or regulations governing such examination. … Under penalty of perjury, I declare that all of the statements contained in this application are true.  I understand that providing false information may be cause for denial or revocation of the certification credential." *Id.*

The information in the NBCRNA certifications comes directly from Medatrax[5], an on-line computer system which tracks the students' activity during their clinical experience.  (Abraham at 136, Schumann at 27.)  In addition to having numerous fields where students can enter types of cases, anatomic categories, methods of anesthesia, regional techniques, pharmacologic agents, anesthetic management, arterial techniques, and other relevant data, Medatrax has a field for "Actual Clinical time (REQUIRED)."  *See, e.g.*, Abraham Exh. 18.

All of The Students personally entered data into this field.  (Abraham at 93-94; Biagan at 108-09; Gibson at 100; Nachtrab at 21; Rosado at 24-25; Schumann at 25-26; Vinas at 24-25).

---

[5]  The last class eligible to participate in this case, 2012A, switched from Medatrax to Empower, although both systems are similar.  (Schumann at 25.)  For ease of reference, Defendants will refer to these on-line systems as "Medatrax" only.

Abraham and Biagan tried to enter their Medatrax data daily.  (Abraham at 93-94; Biagan at 108-09).  Rosado and Schumann tried to enter their data daily, and they would never go more than a few days without doing it.  (Rosado at 24-25; Schumann at 25-26, 30-31).  For Gibson, however, it "varied," and she may have gone up to a month without entering data.  (Gibson at 100).  Vinas' efforts to enter her data ranged from daily to monthly (Vinas at 24-25); Nachtrab's between same day and "a couple of weeks" (Nachtrab at 21).

Abraham and Schumann, the named Plaintiffs, testified that they entered their clinical time accurately at least at times.  Abraham counted clinical time to include "the time as we're required to be there.  They told us to be there at 6:00 a.m. … I started the clinical time at 6:00 a.m." (Abraham at 135).  In other words, clinical time started when Abraham arrived on site and it ended when Abraham left the clinical site at the end of the day.  (Abraham at 135).  Schumann testified that while he was not always accurate with clinical time at the beginning of his clinical experience, "particularly toward the end [] I began counting more of the time – the time that was actually in clinical," entries that he described as "pretty accurate" and which he asserts will support his claim that he "worked" 45-60 hours per week.  (Schumann at 28-29, 119-22, 172).

In contrast, Gibson testified that she did not record all of her clinical time in the "REQUIRED" clinical time field, although she understood she was required to complete the field.  (Gibson at 111, 113.)  In fact, Gibson could not even explain what clinical hours where supposed to include.  (Gibson at 30.)  Biagan recorded her clinical time yet another way, supposedly running it from the time she greeted her first patient of the day and ending it when she took her last patient of the day to recovery.  (Biagan at 110.)  She claims she did not include the time she arrived to "set up" before her first case which she estimates at two hours every day, nor did she include another 30-40 minutes at the end of her day.  (Biagan at 110-11, 142-43.)

Students were assigned call shifts, but there were not always cases and they were not always called to the clinical site during those shifts.  (Abraham at 137-38; *see also* Rosado at 29; Vinas at 120).  When on call away from the clinical site, the only restrictions on the students were that they needed to be within 30 minutes of the clinical site and they could not be impaired; otherwise, they could use their time as they wanted.  (Abraham at 138-39; Nachtrab at 150-51).  Abraham frequently included 24 hours, whether or not he was called to the clinical site, in his clinical time.  (Abraham at 137-42, Exh. 18)  For example, in March 2011, Abraham had call shifts on March 3, 7, 10, 19, 21 and 29.  (Abraham Exh. 18, 19).  He had "0" cases and "0" anesthesia time on those days (which he admits indicates he was not called to the clinical site (Abraham at 137-38)), but he recorded the nine hour call shift as clinical time.  (Abraham at 137-43, Exh. 18).  In contrast and for example, Gibson and Schumann did not include their call shifts as clinical time if they were not called to the clinical site.  (Gibson at 104-05, Exh. 26 (*e.g.,* May 2010); Schumann at 153-54, Exh. 34.)

Abraham admitted that every day of claimed "work" at the clinical sites would be reflected in Medatrax; Schumann testified similarly.  (Abraham at 242; Schumann at 134-35.)  Gibson disagreed, testifying that "most of the time" she was at a clinical site is reflected in Medatrax, but not every day.  (Gibson at 95.)

As the foregoing shows, Defendants would have to question Opt-Ins because no representative testimony exists.

3.     **Statute of Limitations**

Defendants have individualized defenses to be applied to the claim of each Plaintiff and Opt-In.  FLSA claims must "normally" be brought within 2 years and plaintiffs have the burden of proving that defendant's conduct was willful for the purpose of extending the statute of limitations to 3 years.  *Lockaby v. Top Source Oil Analysis,* 998 F. Supp. 1469 (N.D. Ga. 1998)

(summary judgment for defendant).  To prove a willful violation, plaintiffs must prove that defendant "either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute." *McLaughlin v. Richland Shoe Co.,* 486 U.S. 128, 133 (1988).

Where a defendant assumes that a student could be unpaid in an externship because it knew that the student would receive academic credit for the work and completion of the externship was required for graduation, it is established that there is no proof of willful conduct and summary judgment is appropriate based on the 2 year statute of limitation.  *Kaplan v. Code Blue Billing & Coding Co.,* 504 Fed. Appx. 831 (11th Cir. 2013).  This is so despite the students' claim that they engaged in hands-on work "of little educational benefit." *Id.* at 833.  Clearly, Defendants here could properly assume that the students could be unpaid.  Not only did the students receive academic credit for the clinical activities, as in *Kaplan,* but the clinical experience was a requirement to graduate from the Masters program imposed not by Defendants, but rather by accreditation authorities and law and also a requirement to qualify for the national CRNA certification exam imposed by the NBCRNA.  It was a required part of an accredited Masters degree program.  Actually, as shown in the motion for summary judgment, the law fully supports Defendants and it is Plaintiffs who are attempting to reverse and circumvent the law and create new law of first impression – which clearly leaves no basis for a willful allegation.

Even if a defendant acts unreasonably, *Id.,* or negligently, its acts are not willful.  *Reich v. Dept. of Conservation & Natural Resources,* 28 F. 3d 1076 (11th Cir. 1994).  Thus, where the plaintiff was treated in pay as a non-employee and there are "mixed factors" as to employee status, the two year statute of limitations applies.  *Crumpton v. Sunset Club Prop.,* 2011 U.S. Dist. LEXIS 83987, *9 (M.D. Fla. Aug. 1, 2011) (Steele, J.) (although services were integral to

defendant's business and rendered with a reasonable degree of permanency over 2 ½ years

utilizing the equipment of defendant, the 2 year limitations period applied).

Under 29 U.S.C. 256, an opt-in's action is commenced when he/she files a written

consent to join the suit and is not tolled by the filing of the original complaint of the named

plaintiff.  Here, the statute of limitations will have to be individually applied to each Opt-In

claim.  The following opt-in claims were filed more than 2 years after graduation and are barred

as untimely and they should be dismissed (Dkt. 175, *et. seq.,* Ortega Dec. at ¶32:[6]

| Name | Graduation Date | Opt-In Date |
|------|-----------------|-------------|
| Caloian | 2/4/11 | 5/20/13 |
| Little | 2/4/11 | 5/24/13 |

Moreover, all the Plaintiffs' and Opt-Ins' claims are subject to the two year statute of

limitations and, for example, the following Pre-Notice Opt-Ins have at most claims that could

pertain to only a portion of their clinical experience:

| Name | Graduation/End Date | Opt-In Date | Days within 2 years |
|------|---------------------|-------------|---------------------|
| Biagan | 9/23/10 | 8/15/12 | 40 |
| Benjamin | 9/23/10 | 7/20/12 | 65 |
| Smith | 2/4/11 | 8/30/12 | 159 |
| Gibson | 2/4/11 | 8/10/12 | 179 |
| Rosado | 2/4/11 | 8/6/12 | 183 |
| Nachtrab | 2/4/11 | 7/27/12 | 193 |
| Bourn | 2/4/11 | 7/25/12 | 195 |

Other Post-Notice Opt-Ins who have the benefit of Court ordered tolling (see Doc. 35 and

77) have claims for less than 75 days:

---

[6]  The Court tolling period from 8/29/12 (Dkt. 35) to 12/10/12 (Dkt. 77) of 103 days does not affect the untimeliness of these claims.

| Name | Graduation Date | Opt-In Date |
|------|-----------------|-------------|
| Zoccoli | 6/10/11 | 7/11/13 |
| Jalacki | 6/10/11 | 7/15/13 |

Clearly, each Plaintiff and Opt-In's schedule would have to be individually reviewed on a daily basis to assess their claim.

## C. Fairness and Procedural Concerns

Plaintiffs and Opt-Ins claim the following damages:

| Student | Wages Claimed | Liquidated Damages Claimed | Post-Graduate CRNA Income Per Deposition |
|---------|---------------|----------------------------|------------------------------------------|
| Schumann | $23,074.80 - $30,364.00 | $46,149.60 - $60,728.00 | $160-$170,000 |
| Abraham | $16,186.80 - $23,857.20 | $32,373.60 - $47,714.40 | $230,000 + overtime |
| Arminio | $22,332.00 - $28,425.00 | $44,664.00 - $56,850.00 | No deposition |
| Benjamin | $19,940.00 - $25,380.00 | $39,880.00 - $50,760.00 | Did not graduate |
| Biagan | $7576.80 - $11,167.20 | $15,153.60 - $22,334.40 | Did not graduate |
| Bourn | $27,118.40 - $34,516.80 | $54,236.80 - $69,033.60 | No deposition |
| Gibson | $27,118.40 - $34,516.80 | $54,236.80 - $69,033.60 | $148,000 + overtime |
| Hakenewert | $16,966.80 - $17,946.00 | $33,933.60 - $35,892.00 | No deposition |
| Nachtrab | $25,922.00 - $32,994.00 | $51,844.00 - $65,988.00 | --- |
| Penton | $24,108.00 - $31,724.00 | $48,216.00 - $63,448.00 | No deposition |
| Rosado | $23,419.20 - $30,817.60 | $46,838.40 - $61,635.20 | $120,000 |
| Smith | $23,419.20 - $30,817.60 | $46,838.40 - $61,635.20 | No deposition |
| Tidwell | $25,523.20 - $32,486.40 | $51,046.40 - $64,972.80 | No deposition |
| Student 24 | $25,379.20 - $28,425.60 | $50,758.40 - $56,851.20 | No deposition |
| Vinas | $23,928.00 - $30,456.00 | $47,856.00 - $60,912.00 | $238,000 + overtime |
| White | $14,755.60 - $18,781.20 | $29,511.20 - $37,562.40 | No deposition |

(Dkts. 46-57, 62-63, 66, 68).

As held in *DeMauro*, the "economic realities test is fact intensive and requires individualized analysis" and "would contravene the basic theory of judicial economy upon which the certification of collective actions is based." *Id.* at 11.  As held in *Blakes, supra*, at 62:

> The final factor the court considers in determining whether the suit should continue on a collective basis turns on fairness and procedural concerns.  *See Strait*, 911 F. Supp. 2d at 718.  The collective action device is designed to promote judicial economy and to protect the interests of plaintiffs **whose damages claims might be too small** to justify the high costs of an individual lawsuit.  But those interests are not served where the "need to address individualized factual issues" cuts against any efficiency to be gained from collective treatment and makes the aggregation of claims unmanageable.  *See Hundt v. DirectSat USA, LLC*,    F.R.D.    , 2013 U.S. Dist. LEXIS 92458, 2013 WL 3338586, at *8 (N.D. Ill. July 1, 2013); *see also Camilotes*, 286 F.R.D. at 353 ("While Plaintiffs' desire to litigate collectively for economic reasons is understandable, it does not override the negative effects that certification is very likely to have on the fairness and manageability of the proceedings.")

In this case, there are only 25 students involved, and collective treatment would not be needed for judicial efficiency nor is it legally warranted.  As shown above, representative testimony would be unduly prejudicial and violate due process.  These 25 former students now enjoy large incomes as CRNA's (and are not rank-and-file low income workers seeking to collectively pursue small claims).  Their action should be dismissed on summary judgment motion but if in some respect it were not, as held in *Keef, supra*:

> The potential benefit from trying ten cases as a collective action is not at all clear.  Indeed, it seems that trying cases simultaneously would complicate any nuanced inquiry.

Accordingly, absent dismissal of the entire action, the collective action should be decertified.

Joined by:                                  Respectfully submitted,

By: /s/ Jeffrey Fridkin                     By: /s/ Tammie Rattray
    Jeffrey D. Fridkin                          Tammie L. Rattray
    Florida Bar No. 0490245                     Florida Bar No. 0128619
    jfridkin@gfpac.com                          trattray@fordharrison.com
    GRANT FRIDKIN PEARSON, P.A.                 Robert D. Hall, Jr.
    5551 Ridgewood Dr., Suite 501               Florida Bar No. 186760
    Naples, Florida  34108                      rhall@fordharrison.com
    Telephone:  (239) 514-1000                  Bradley R. Hall
    Facsimile:   (239) 514-0377                 Florida Bar No. 0026172
                                                brhall@fordharrison.com
    Attorneys for Defendant Collier             FORD & HARRISON LLP
    Anesthesia, P.A.                            101 E. Kennedy Boulevard, Suite 900
                                                Tampa, Florida 33602
                                                Telephone:  (813) 261-7800
                                                Facsimile:   (813) 261-7899

                                                Attorneys for Defendants Wolford
                                                College LLC, Thomas L. Cook and
                                                Lynda M. Waterhouse

## CERTIFICATE OF SERVICE

    I HEREBY CERTIFY that on February 28, 2014, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send a notice of electronic filing to:

Bradley P. Rothman
Weldon & Rothman, PL
7935 Airport-Pulling Road N., Suite 205
Naples, Florida  34109

Ryan D. Barack
Michelle Erin Nadeau
Kwall, Showers & Barack, P.A.
133 North Fort Harrison Avenue
Clearwater, Florida 33755

/s/ Tammie Rattray
Attorney

TAMPA:354255.1

26