THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

BILLY SCHUMANN, DUSTIN ABRAHAM,
ON BEHALF OF THEMSELVES AND
OTHERS SIMILARLY SITUATED,

        Plaintiffs,

v.

COLLIER ANESTHESIA, P.A., a Florida
corporation, WOLFORD COLLEGE, LLC, a
Florida limited liability company, THOMAS
L. COOK, an individual and LYNDA M.
WATERHOUSE, an individual,

        Defendants.

_____/

CASE NO.: 2:12-cv-347-FtM-29CM
COLLECTIVE ACTION

**DEFENDANT COLLIER ANESTHESIA, P.A.'S
MEMORANDUM OF LAW IN OPPOSITION TO
PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

    Defendant Collier Anesthesia, P.A. ("CAPA"), files this Memorandum of Law in

Opposition to Plaintiffs' Motion for Partial Summary Judgment filed February 28, 2014 [Doc.

#173], as follows:

**PLAINTIFFS' STATEMENT OF UNDISPUTED FACTS IS A FARCE INTENDED TO
CREATE THE ILLUSION OF DISPUTED MATERIAL FACTS**

    1.    On the very first page of Plaintiffs' motion, Plaintiffs have chosen to make a

mockery of the summary judgment process. On the very first page, plaintiffs' claim, under their

"Undisputed Facts," that they "worked for CAPA without pay." That they "worked for CAPA"

is obviously a major contested ultimate legal issue, not an "Undisputed Fact." Plaintiffs are

actually trying to create the appearance of contested issues of fact where none exist. They do so

in a strategic attempt to avoid summary judgment for the defense. Their statement of "Undisputed Facts" gets worse.

2.      On page two, paragraph two, they state as an "Undisputed Fact" that CAPA is "comprised of…SRNAs, specializing in anesthesia." That is a ridiculous statement, and is anything but an "undisputed fact." (See Doc 179-100, ¶ 2; and Declaration of Keri Ortega and Student Handbook (Doc. 175-1).

3.      There are truly no "material" facts appearing in paragraphs 3 through 7 worthy of taking time to contravert.

4.      In paragraph 8, page 4 of their motion, Plaintiffs admit that CAPA MDs "serve as clinical instructors for Wolford (without additional pay)." That is indeed "undisputed" and material.

5.      In paragraph 10, pages 4-5 of their motion, Plaintiffs admit, and it is undisputed, that Wolford earned and enjoys a 10-year accreditation from COA. This status permits Plaintiffs, upon graduation from Wolford, to sit for the national CRNA boards (NBCRNA), and thereby upon passing to become eligible for licensing as a CRNA. (See Doc. 175-1, paragraphs 3,4 and 7). Becoming licensed, in turn, allows these students to move from some earning less than $50,000 per year to some now earning more than $200,000 per year! Gibson deposition, Doc. 179-14, 22:1-24; and Vinas deposition Doc. 179-75, 33:1:25.

6.      On page five of their motion, paragraph 11, Plaintiffs state:

> "When assigning SRNAs to cases, however, the CAPA Scheduler did
> not take into account the student's knowledge and ability; the physical
> status of the patient; the complexity of the anesthetic and/or surgical
> procedure; or the experience of the instructor."

Plaintiffs misrepresent this quoted statement as being part of the "Undisputed Facts," and CAPA strongly objects to that false characterization. They have attached the improper label of "CAPA

Scheduler" to witness Barbara Rose ("Rose"). They have actual knowledge that Rose was not the "CAPA Scheduler." Rose testified that the CRNA Scheduler was Dr. Staab. (Rose deposition, Doc.179-97, 157:21-25). Initially, in her employment, Rose was provided with student names for the schedule by Dr. John Nolan, then Dean of Students at Wolford. He instructed her as to what she was supposed to do. She did not set any policy, but merely did what she was instructed to by Dr. Nolan. (Rose deposition, Doc. 179-97, 157:4-20). After Dr. John Nolan, Dr. Keri Ortega with Wolford College oversaw Rose's schedules to verify that SRNAs were being properly assigned. (Rose deposition, Doc. 179-97, 15:2-16; 46:7-20). CAPA anesthesiologists were scheduled by Dr. Statfield. Ms. Rose did not know anything about how that worked. (Rose deposition, Doc. 179-97, 44:2-7). Whatever schedules Rose prepared were simply initial schedules which went to others with specific competencies for review and approval. (Rose deposition, Doc. 179-97, 158:10 through 160:2; 162:7 through 163:3; 164:9-20; 175:19 through 176:10; 178:3-22; 179:9-13; 180:14-18; 181:11-14; 203:5-19). Rose was a clerical employee of CAPA. (See Second Declaration of Thomas Cook, M.D., Doc. 199-1, ¶3). She was not privy to any information regarding the educational needs of students because it was not part of her job description. (Rose deposition, Doc. 179-97, 149:22-150:1). She was never an officer, director or shareholder of CAPA. She never attended a board meeting, nor an executive committee meeting. (Rose deposition, Doc. 179-97, 150:1-16). She had no knowledge of any financial information regarding CAPA, nor any knowledge about the payroll records of CAPA. (Rose deposition, Doc. 179-97, 150:17-22). She had no personal knowledge of the methodology by which CAPA compensated any of its employees other than herself. (Rose deposition, Doc. 179-97, 150:24-151:2). She admits that she was not "privileged" to the payroll, but she was not

beyond "clearly speculating" when she gave opinions in response to Plaintiffs' counsel's questioning about things she had no personal knowledge of. (Doc. 179-97, 131:3-22).

7.      Importantly, Rose had no knowledge of what is going on inside operating rooms, nor the procedures occurring inside operating rooms. She was neither a CRNA, nor an MD, and truly was not aware of what happened inside an operating room. (Rose deposition, Doc. 179-97, 151:3-22). When it comes to a situation where a single CRNA is supervising two students, she really does not know how that works in the field. (Rose deposition, Doc. 179-97, 151:24-152:3). She has no knowledge of how much the "need" for "nurses" may have decreased as a result of the students. (Doc. 179-97, 93:14-19). When asked by Plaintiffs' counsel if an afternoon shift was "important to the cases running as planned," she replied:

> "I really can't say for sure. I was never on the floor. I was never in the ORs.
> I don't know. **I'm not competent enough to make that determination.**"
> (Rose deposition, Doc. 179-97, 28:17-24).

8.      Rose was never privy to any discussions where the business needs of CAPA were the subject matter and the person she was having the discussion with was an officer of CAPA. (Rose deposition, Doc. 179-97, 152:21-153:4). Rose had no persons who reported to her, and within the hierarchy of the chain of command in CAPA reported only upwards. (Rose deposition, Doc. 179-97, 156:23-157:3).

9.      Thus, the quotation above regarding the "CAPA Scheduler" taken from page 5 of Plaintiffs' motion (Doc. 173), in the section entitled "Undisputed Facts," is actually a misrepresentation by the Plaintiffs of the true facts. Plaintiffs repeat this misrepresentation of the actual facts concerning Rose on page 8, at the end of ¶17, of their list of "Undisputed Facts." CAPA objects each and every time that label is wrongly used to apply to Ms. Rose.

10.     Plaintiffs admit in paragraph 13 of their motion (Doc. 173) that CAPA does pay a clinical fee to Wolford of $1500 per student per semester.  This burden is undertaken by CAPA to underwrite the costs to Wolford College of its educational program, and to assist Wolford College in remaining eligible for federal student loan funding. (Doc. 179-100, ¶ 13). Many of these student/plaintiffs here availed themselves of this benefit, underwritten for them through the burden accepted by CAPA. (Depo of Abraham at 94-96, Doc. 178-1, Exh.14, Doc. 178-13; Depo of Biagan at 72-73, Doc. 179-1,  Exh. 8-10, Doc. 179-9 and 179-11; Depo of Gibson at 82, Doc. 179-14, Exh. 19-20, Doc. 179-30-31; Depo of Nachtrab at 55-58, Doc. 179-33, Exh. 10-11, Doc. 179-44 -179-45; Depo of Rosado at 183-84, Doc. 179-53, Exh. 18, 19, Doc. 179-69-70; Depo of Schumann at 101-07, Doc.177-3, Exh. 28-31, Doc. 177-18-21; Depo Vinas at 104, Doc. 179-75, Exh. 18, 19, 21-22, Doc. 179-89, 179-90-93).

11.     For the reasons set forth in paragraphs 6-9 above, CAPA objects to the false characterization of the CAPA Scheduler used in ¶¶ 24 and 25, pg. 11 of Plaintiff's motion (Doc. 173).  Plaintiffs themselves admit in paragraph 24 (Doc. 173) that CAPA anesthesiologists oversaw and approved all schedules prepared by their clerical employee, Barbara Rose.

12.     CAPA objects to the false statements in paragraph 28 of the "Undisputed Facts" (Doc 173, p. 12) relating to "CAPA worked SRNAs…"  The SRNA learning opportunities described in that paragraph are essential skills which a CRNA must have, and that is the sole reason these students were afforded the opportunity to perform these tasks. (See Declaration of Dr. Thomas Cook, ¶¶3 & 4 (Doc. 172).  See also, Declaration of Ken Kirsner (Doc. 179-99, pg. 5), and deposition excerpts of Leslie Hussey, 89:19 through 94:20 (Doc. 171).

13.     Also in their recitation of "Undisputed Facts" Plaintiffs state, on page 14 (Doc. 173):

"Without SRNAs, Bonita would require either (a) two MDs or (b) one MD and two CRNAs."

To support this highly disputed and completely unestablished fact, they make reference to the testimony of Rose. CAPA objects that this fact is not supported by admissible evidence. Rule 56 (c)(2), F.R.C.P. Rose lacks the personal knowledge and experience necessary to draw lay conclusions, and thus is not a competent witness to support the statement. As already established, she was not a CRNA, nor an MD. There was absolutely no testimony derived from Rose which would qualify her as having sufficient personal knowledge, experience or training to be a competent witness to draw the conclusion Plaintiffs attribute to her in their statement of "Undisputed Facts." Certainly the cited passages to her deposition in no way establish her competency to reach the conclusion referenced. The Declaration of Dr. Daniel Janyja, Doc.198-1, refutes Ms. Rose's incorrect conclusion and stands as the only competent and admissible evidence on the subject.

14.     On page 15 of the motion (Doc. 173), Plaintiffs counsel makes improper legal arguments under the rubric of "Uncontested Facts" concerning 42 CFR Sec. 414.61, the CRNA Teaching Rule. It is just a complete mischaracterization for counsel to say that the CRNA Teaching Rule, which is the label the federal government puts upon this billing policy, "has nothing to do with how to teach." That was not what the referenced witness testified to. What she testified to was that the CRNA Teaching Rule was not "an authority on how to teach." (Depo of Corp. Rep at 63:6-12, Doc.173-7). And of course she was correct. But the mischaracterization of her testimony belies Plaintiffs' efforts to draw away the court's attention from the fact that having SRNAs alone in the room with the patient, with licensed professionals immediately available, is an important part of the learning experience. (Doc. 175-7, ¶ 16; Declaration of Dr. Cook, Doc. 172.

15.     Plaintiffs continue their misrepresentation of "Undisputed Facts" on page 15 of their motion (Doc. 173), where they state:

> "Cook reviewed the daily schedule with the goal of using SRNAs to eliminate CRNAs."

That statement is just plain false. (See Second Declaration of Thomas Cook, M.D., Doc. 199-1). Plaintiffs' footnote 25 shows clear knowledge that this statement was not an "Undisputed Fact." However, that falsity, like the contested statement itself, is immaterial because the record discloses that even if it were a "goal" to "eliminate CRNAs" that goal failed.   CAPAs corporate representative provided to Plaintiffs counsel the actual payroll costs of CAPA CRNAs, and the numbers of employed CRNAs, throughout the relevant time period. (Corp. Rep. Depo [Lynda Waterhouse] of 1-14-14, Doc. 173-7, Ex 2.)   That Exhibit shows that, despite fluctuating increases and decreases in the numbers of students in Wolford classes, CAPA CRNA payrolls remained relatively constant, and its number of employees remained relatively constant as well. (See also Doc. 175-13 for the fluctuating numbers of students per semester.)   If Plaintiffs theory of the case were correct (which it clearly is not), there would be a clear inverse relationship between the numbers of students per semester and the number of CRNAs on CAPA payroll. This objective evidence vitiates Plaintiffs' theory of displacement. As discussed more fully below, the statement, and others like it, attributable to Dr. Cook are further immaterial because the only competent evidence on the subject of students displacing CRNAs on 3/6/2012, the date which Ms. Rose's statements are tied to, is contained in the Declaration of Dr. Daniel Janyja (Doc. 198-1).   That testimony establishes that SRNAs did not displace CRNAs on 3/6/2012, or at any other time. Rose makes many other statements about things Dr. Cook supposedly said to her concerning getting "nurses" off the schedule.   Dr. Cook has expressly denied all such statements. (Second Declaration of Dr. Cook, Doc. 199-1). He never refers to the professional CRNAs as

"nurses." However, none of those disputed discussions are material in the context of all pending motions for summary judgment in this cause.

16.     The entirety of pages 15 and 16 of Plaintiffs' statements of "Undisputed Facts" are comprised completely of lay opinions of Barbara Rose, and legal opinions of counsel for Plaintiffs, all given without any foundation of personal knowledge or experience. The entirety of paragraph 34 of Plaintiffs' "Undisputed Facts" consists of an incompetent analysis of Exhibit 26 to Barbara Rose's deposition. (Doc. 173-13, pgs. 109-112). That exhibit is a copy of the posted schedule for CAPA facilities on 3/6/2012. Without any predicate of personal knowledge or experience to support her testimony, Rose gave her opinion that main OR rooms 2 and 3, and rooms 8 and 10, as scheduled, would require additional CRNAs if the SRNAs appearing on the schedule were not present.  She also gave her opinion that if SRNAs were not on the schedule at Bonita, at North Collier, at DSS, and at any other facility where there were single CRNAs supervising two rooms, each with a single SRNA, that an additional CRNA would have to be present if the SNRA were not on the schedule.  None of this testimony was based upon the personal knowledge of Rose, because from the moment she arrived in her position, there were always SRNAs.  Rather, this testimony constituted lay opinion by a person who lacked the personal knowledge or experience to opine on the subjects.

17.     CAPA objects to the entirety of pages 15 and 16 as not being factual, and to the extent factual not being supported by admissible evidence. Rule 56(c)(2). The true and only competent and admissible evidence regarding the need for additional CNRAs in the event SRNAs ceased their clinical education appears in the Declaration of Dr. Daniel Janyja (Doc.198-1), discussed more fully below.  His conclusion, based upon personal knowledge and actual

experience, is that no additional CRNAs would be needed if all of the SRNAs were gone and off the schedule on 3/6/2012.

18.     Rose's incompetent testimony referenced on pages 15 and 16, with a small amount of bleed into page 17, is the lynchpin of Plaintiffs' entire case. Plaintiffs do not pretend to have any other witnesses to support their claims that the defendants derive economic benefit from them, or that they displace regular workforce. Their only witness to support the entire premise of their case, as set forth on pages 21 through 23 of their legal argument, is the testimony of Rose. Because her testimony would be inadmissible at trial , Plaintiffs' recitations of her "Undisputed Facts" do not give rise to genuine issues of material fact which could defeat CAPA's and the other defendants' dispositive motions for summary judgment.

## BARBARA ROSE LACKS SUFFICIENT PERSONAL EXPERIENCE AND TRAINING TO BE COMPETENT TO DRAW ANY CONCLUSIONS ABOUT CAPA CRNA STAFFING REQUIREMENTS

19.     Nowhere in the Plaintiffs' motion, nor in the deposition of Ms. Rose, did Plaintiffs' counsel establish Rose's credentials sufficient to show her competency with respect to the requirements of safety and law in the assignment of CAPA personnel to operating rooms.  In fact, to the contrary, the record of Rose's deposition established that she had no competency in this area. She candidly admitted her lack of competency with respect to the importance (or lack thereof) of shifts in the operating room because she has never been there! See paragraph 7 above. She was at all times a clerical employee who performed what she was instructed to perform with respect to placing names provided to her by others on a grid prepared for her by others. (Declaration of Dr. Janyja, Doc.198-1, ¶15). She admitted to having no policy making role whatsoever in the schedule.  She admitted to not having been privy to any of the business needs

of CAPA.  She admitted to having no clinical experience whatever, and no knowledge of what happens in the operating rooms where CAPA delivers anesthesia services.

20.     Ms. Rose cannot testify to a matter about which she has insufficient personal knowledge.  Federal Rules of Evidence, Rule 602, provides:

> "A witness may testify to a matter only if evidence is introduced sufficient to support a finding that a witness has personal knowledge of the matter."

There is nothing in the deposition of Rose to establish her personal knowledge of the requirements, either by safety standards or legal standards, regarding the presence or absence of a CRNA in CAPA operating rooms.  Plaintiffs did not list Rose as an expert, and make no pretense about establishing her qualifications to provide expert testimony.  As stated by Judge Covington in *Peeler v. KVH Industries, Inc.*, 2014 WL 117101 (MD Fla. 2014):

> "A non-expert witness 'may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter.'"

It has been recognized that an affidavit is inadmissible if the witness cannot actually have perceived or observed that to which they testify. *Great American Insurance Company v. Moye*, 2010 WL 288965 (M.D. Fla. 2010).

21.     Rule 56(c)(2), F.R.C.P., applies to the Barbara Rose deposition conclusions regarding the requirements of a CRNA in the absence of students.  Rule 56 (c)(4), mandates that affidavits be based upon personal knowledge.  That requirement applies with equal force to deposition testimony. *Samuels v. Doctors Hospital, Inc.*, 588 F. 2d 485, 486,fn 2 (5th Cir. 1979); *Watson v. Adecco Employment Services, Inc.*, 252 F. Supp.2d 1347 (M.D. Fla. 2003).  As recognized in *Macuba v. Deboer*, 193 F.3d 1316 (11th Cir. 1999), deposition testimony relied upon at a motion for summary judgment stage must itself contain admissible evidence.

22.     Here, Ms. Rose has never created a schedule which does not involve students. She has been instructed by others with proper competencies how to fill out a template which has always included students.  She can only speculate as to what would be required if there were no students because she has never experienced it. Her lack of personal experience renders her incompetent as a witness to give her lay opinion on this matter. Ms. Rose's conclusory, uncorroborated statements of opinion in her deposition are not sufficient to create an issue of fact for trial sufficient to defeat the Defendants' motions for summary judgment. *Solliday v. Federal Officers*, 413 F. Appx. 2006, at 2007 (11th Cir. 2011); *Earley v. Champion International Corp.*, 907 F. 2d 1077, 1081 (11th Cir. 1990).

**THE ONLY COMPETENT EVIDENCE OF RECORD CONCERNING THE SCHEDULING OF 3/6/2012, COMES FROM DR. DANIEL JANYJA**

23.     Plaintiffs have built their entire case upon an incorrect and incompetent reading by Rose of the schedule identified as Exhibit 26 at Ms. Rose's deposition. Attached as **Exhibit A** is a copy of that schedule.

24.     Attached as **Exhibit B** to this motion is a schedule prepared by CAPA's Dr. Daniel Janyja.  Dr. Janyja is a Board Certified Anesthesiologist intricately familiar with the requirements of the operating room and the safe and lawful practice of anesthesia therein.  (See Declaration of Dr. Daniel Janyja, Doc.198-1).

25.     Dr. Janyja demonstrates in Exhibit B that, utilizing the existing personnel available to CAPA on March 6, 2012, CAPA could easily perform all of its cases scheduled on that day utilizing its existing work force and at no additional cost. Dr. Janyja's Declaration explains in substantial detail why the schedule would work without students. His explanations, based upon his personal experience and knowledge of the operating rooms where anesthesia and

medicine are practiced, stand in stark contrast to Rose's admitted lack of personal knowledge or experience, which resulted in her mistaken and inadmissible conclusions. Dr. Janyja's Declaration makes the following critical and uncontestable points:

(a)     Where cases are shown to be concurrent involving the same surgeon, the overlap exists with respect to room preparation, not anesthesia time. Surgeons can only cut open and suture close their patients one at a time, and redundant licensed anesthesia provider coverage is daily built into CAPA's practice;

(b)     Scheduling of operating rooms is a highly complex and fluid process which changes up to the last minute on a daily basis. CAPA's existing personnel, with no students, are capable of meeting their patient safety and legal obligations with existing personnel and without need for additional personnel costs.

(c)     Depending upon the payor for a given patient's services at the Bonita facility, CAPA could actually make more money without the students there (if an insured patient), or incur a very slight increase in costs (if a Medicare patient) if students were not given learning opportunities at the Bonita facility if CRNAs were to be used;

(d)     Overall the students are a burden to CAPA, not a benefit, because, among other reasons, the learning process impedes the actual delivery of anesthesia; and

(e)     Students do not displace CAPA personnel.

### UTILIZATION BY CAPA OF THE CRNA TEACHING RULE CANNOT CONVERT THESE STUDENTS INTO EMPLOYEES

26.     Plaintiffs erroneously contend that "regulations may incentivize a company to use students for their own benefit for billing purposes which could then create FLSA liability for the company." (Doc. 173, pg. 23). The only citation of authority to this erroneous statement of law

is *Solis v. A+ Nursetemps, Inc.*, 2013 WL 139863 (M.D. Fla. 2013). That case does NOT stand for the proposition cited by Plaintiffs. Rather, that case stands for the proposition that, in the context of an analysis of whether a putative employee is an independent contractor, any characterization under state law, by statute or otherwise, has no bearing for purposes of the FLSA. *Id.,* at 1395865. Here, however, we are not talking about state common or statutory law. We are talking about potential conflicting federal law.

27.     42 CFR §414.61 (January 1, 2010), is a specific regulatory enactment which follows the passage in 2008 of the Medicare Improvement and Patient Protection Act, and specifically §139 of MIPPA. It was enacted 72 years after enactment of the FLSA. It specifically describes its application in circumstances where a CRNA is teaching two SRNAs. The comments to the Federal Register indicate that this federal regulatory enactment was the product of recognition that 2:1 supervision, involving both CRNAs and anesthesiologist being in the area of the operating room, is recognized as fully approved and an essential part of the learning process:

> Subsequent to issuing the proposed rule and receiving comments, we learned more about the supervision requirements for student nurse anesthetists. According to the AANA, the standards of the Council on Accreditation of Nurse Anesthesia Programs address supervision of student nurse anesthetists in anesthesia cases. These standards require that in any case involving a student nurse anesthetist, including concurrent cases, a qualified anesthesia provider (CRNA or anesthesiologist) must be present and immediately available in the anesthetizing locations.

> Furthermore, according to these standards, the qualified individual must be physically present in the area and immediately available for the student to summon for clinical assistance should it be required. As a result, if one teaching CRNA were temporarily occupied, another qualified anesthetist would respond.

> Based on information received and in response to comments, we are requiring that the teaching CRNA be present during the case with the student nurse anesthetist. For periods of concurrency for two student nurse anesthetist cases, we are requiring that another anesthesia provider is available and can fulfill the requirements of the AANA standards See 74 Fed. Regis. 61871. (See also Declaration of Ken Kirsner, Doc. 179-99, pg. 7).

28.     It is not uncommon in the vastness of federal laws and regulations that specific enactments of law collide with generalized and broadly sweeping enactments. Courts encountering these circumstances apply a fully understood and established principle of statutory construction. When presented with a potential overlap between the broadly sweeping terms of a statute with general application to an entire class (FLSA to "employees"), and the narrow but specific terms of a statute that applies only to a subgroup of that class (Section 139 MIPPA to students under supervision of a Teaching CRNA in 2 concurrent rooms), conflict is avoided by reading the specific as an exception to the general. *Conart, Inc. v. Hellmuth, Obata & Kassabaum, Inc.,* 504 F.3d 1208, 1210 (11th Cir. 2007); See also *Gilbert v. U.S.,* 640 F.3d 1293, 1308 (11th Cir. 2011); *U.S. v. Snipes,* 611 F.3d 855, 865 (11th Cir. 2010); *Bouchard Transp. Co., Inc. v. Updegraff,* 147 F.3d 1344, 1351 (11th Cir. 1998); *U.S. v. Louwsma,* 970 F.2d 797, 799 (11th Cir. 1992).

29.     To utilize the CRNA Teaching Rule as a vehicle to judicially convert students into employees would not only be a complete frustration of Congressional intent with respect to the purposes of the 2008 enactment of Sec 139(b) of MIPPA, it would put the courts into the position of violating state felony criminal laws by allowing (indeed encouraging) unlicensed individuals to be compensated for performing anesthesia services for pay. See, for example, Fla. Stat. Sec 464.016(c). Shame on Plaintiffs for coming before this court with such a request.

### THE ECONOMIC REALITY IS THAT PLAINTIFFS ARE STUDENTS

30.     It is rather telling about the Plaintiffs' candor that one has to scour their motion to find a glimpse of 11th Circuit precedent on the central issues in this case. Relegated to a minor comment between parenthesis on page 18 of Plaintiffs' motion is the recent case of *Kaplan v. Code Blue Billing & Coding, Inc.,* 504 Fed. Appx. 831 (11th Cir. 2013). In *Kaplan,* the Eleventh

14

Circuit performed its analysis of two claims from two different plaintiffs below, both of whom were students enrolled for course credit at for profit institutions of higher education.  Neither were, like the students here, enrolled in a Masters of Science program mandated by law as a prerequisite to licensing for professional work administering anesthesia. The court in that case looked to the "economic reality" of the relationships.   More to the point, the court said we "must" look to the "economic realities" of the relationship. *Id.,* at 834.  This analysis includes, but is not limited to, "whether a person's work confers an economic benefit upon the entity for whom they are working." *Id.*  The Eleventh Circuit considered:

> (a)    Both engaged in "hands-on work" to obtain their formal degree;

> (b)    Both received educational credit for their work;

> (c)    Both became eligible for degrees as a result of their work;

> (d)    Both caused the business to be less efficient, creating duplications of effort;

> (e)    Both created "little if any" economic benefit to the business;

Under these circumstances, both were held to be students, not employees. *Id.*  This holding was reached solely through the above analysis of the economic realities.

31.    Here Plaintiffs, as a matter of uncontroverted fact, were:

> (a)    Students in a fully accredited college which required hands-on clinical work in order to earn a Masters of Science degree;

> (b)    Students who not only received educational credits for their work, they received actual case experience mandated in order for them to obtain licenses required before they could lawfully work;

> (c)    Students who became eligible for Masters of Science Degrees if they successfully performed their work;

15

(d)     Students who caused CAPA to be less efficient, and duplicative in its efforts;

(e)     Students who created "little if any" economic benefit to CAPA. Under these circumstances, these students/plaintiffs are not employees as a matter of economic reality. *Id.*

32.     In dicta, the Eleventh Circuit felt "supported" by "guidance" provided by the Wage & Hour Division of the Department of Labor's six-factor test applicable to "trainees."  If this court too continues to feel it needs support by guidance provided by the six factors, that guidance shows:

(1)     Plaintiffs "training" is actually an advanced professional study program in an accredited college;

(2)     Plaintiffs become qualified upon graduation to obtain licenses that will permit them to practice anesthesia, a highly regulated activity, and begin to earn more money than a U.S. Senator or Congressman;

(3)     Plaintiffs have no competent evidence to support a finding that they displace regular workers, they are closely supervised in their clinical studies, and the competent evidence of record establishes that they do not displace workers;

(4)     Plaintiffs have no competent evidence of record that they provide any economic benefit to CAPA, and the competent evidence of record establishes that they do not;

(5)     Plaintiffs acknowledged, in writing, at the inception of their education at Wolford College, that they were not entitled to employment upon graduation; and

(6)     Plaintiffs acknowledged, in writing, at the inception of their education at Wolford College, that they were prohibited from being employed as, or to hold themselves out in title or function as, CRNAs.

33.     Plaintiffs ignore completely any analysis of the "economic realities" because they know it will establish that they were students at Wolford College, never employees of anyone. Instead, they wrongly conclude, on page 23 of Doc. 173, that "to avoid liability under the FLSA for Plaintiffs' work, all six of these factors must be met." This court has not so held, and the Eleventh Circuit clearly has held contrary to Plaintiffs on this very issue.

34.     Plaintiffs point this court to *Donovan v. New Floridian Hotel,* 676 F.2d 468, 470 (11th Cir. 1982) on page 18 of Doc. 173, but then fail to perform the "economic reality" analysis required under that case.

35.     The Eleventh Circuit is not alone in choosing to not be bound to a rigid litmus test in determining whether a student could be deemed an employee for the student's work. The Sixth Circuit, in *Solis v. Laurelbrook Sanitarium,* 642 F. 3d 518 (6th Cir, 2011), like the Eleventh Circuit, refused to be shackled by the DOL six factor test, characterizing it as "a poor method for determining the employee status in a training or educational setting." *Id.,* at 525. That court instead focused upon whether it was the students or the beneficiary of the student's work, who was the "primary beneficiary" of the students efforts. *Id.* at 529. The Sixth Circuit noted that, although students provided various services to the public for which the school received payments and benefits, nevertheless the students were the primary beneficiaries of the relationship, and therefore not employees, because they received tangible and intangible benefits learning various vocations, learning to operate tools, being engaged in a course of study approved by state accrediting authorities, and otherwise received a "sound" education. These tangible and

17

intangible benefits were "significant enough to tip the scale of primary benefit in the students'

favor even where the school receives tangible benefits from the student's activities." *Id.,* at 532.

36.     Plaintiffs themselves invoke the "primary beneficiary" test on page 21 of Doc.

173. They state:

> "Although the SRNAs may receive some benefit insomuch as they will be
> eligible to graduate and sit for the CRNA exam at the end of their education as
> a whole, it is clear that CAPA is enjoying the greater benefit of the work
> performed by the SRNA."

37.     How can Plaintiffs argue with a straight face that CAPA is getting a greater

benefit than they are?  Where is that benefit?  Plaintiffs cannot quantify one nickel of benefit to

CAPA.   CAPA does not collect revenue from the Plaintiffs like Laurelbrook did from its

students.  The one case Plaintiffs cite for their primary benefit argument is *Marshall v. Baptist

Hospital,* 473 F.Supp. 465 (M.D. Tenn. 1979), rev'd. on other grounds at 668 F,2d 235 (6th Cir

1981).   That case doesn't help them.  In that case, the hospital billed the public for all of the

work of the x-ray trainees.  This is what that court was dealing with:

> 4. Primary Benefit
> It is beyond question that the defendant received direct and substantial benefit
> from the work performed by trainees, work that would otherwise have been done
> by regular employees and work for which the hospital charged patients at full
> rates.[FN14] Had the training program been found to be educationally sound the
> court might nevertheless have concluded that the bulk of the benefit inured to the
> trainees, but because the trainees were shortchanged educationally the court finds
> that the hospital was the primary benefactor from the relationship *\*477* between it
> and the trainees. Simply stated, the hospital exploited the training program,
> turning it to its own advantage. That its advantage might in turn be to the
> advantage of the public does not justify violating the interests served by the
> FLSA, which are also designed to promote the public good.

Here, unlike in *Marshall,* there is no competent evidence that the Wolford College program was

not "educationally sound."

38.     Plaintiffs cannot seriously contend they were shortchanged where, as here, those among them who graduated quickly and completely achieved the goal they sought when they enrolled:  a chance to sit for, and pass in every instance, the national CRNA boards entitling them to become licensed CRNAs. And since becoming licensed have gone on to make fantastic amounts of money!  Not a single plaintiff went on record in the instant motion claiming that their educations were deficient. In *Marshall,* the x-ray trainees were clearly being exploited:

> Certainly the protracted performance of such tasks as transporting patients to and from various rooms, running film between departments, cleaning up after patient accidents, relieving the receptionist, and answering the telephone appears to have little, if any, relationship to sound educational objectives of a radiologic technology program.

*Id.,* at 476.  No such allegations of answering telephones or cleaning up after patient accidents or relieving the receptionist have been made here, much less any admissible proofs of such. All Plaintiffs here can do is complain about the Affiliation Agreement not being technically followed, or parts of the Handbook not being phrased to their complete satisfaction, or the curriculum not being as "established" as their lawyers would like it to be.  The facts remain that every one of these student/plaintiffs who could manage to graduate from Wolford College could and did successfully attain the right to, and did become, a licensed CRNA. Mission accomplished!

39.     This court should consider the ruling of its sister court in *Demayo v. Palms West Hospital,* 918 F.Supp.2d 1287 (S.D. Fla. 2013). It is perhaps the most factually similar circumstance to this case in the existing jurisprudence. There the court applied the "economic realities" test to a claim by a surgical tech student that she should be paid for going to school. She was required to participate in 125 surgical procedures but in the course of her unpaid internship participated in 185.  She had to perform repetitive and menial tasks, including taking

out the garbage. She was not guaranteed a job, and understood she would not be compensated. She received grades and course credit for the externship. Judge Ryskamp granted summary judgment against the student, and for the school, noting:

> "The gist of Plaintiff's argument to the contrary rests in the fact that she performed non-surgical work, such as stocking instruments and supplies, organizing files, and taking out the garbage. Plaintiff's argument misses the point, however. While this type of work may, generally, be the type of work covered by the FLSA, it is part-in-parcel to the tasks a surgical technologist performs. And, the central purpose of Plaintiff's externship was to perform the work of a surgical technologist -- that is, of course, the very reason she attended MedVance."

* * * *

> "While these aspects of the job may be less appealing to Plaintiff, she cannot claim they are so outside her educational experience as a surgical technology extern to provide grounds for the retroactive instatement of compensation as an employee. As the court in *Solis* reasoned, Plaintiff benefited not only from the hands-on training she received by participating in surgical procedures, but also from a general gain of responsibility, knowledge, and experience earned from the less glamorous parts of her work, such as sterilizing instruments, stocking supplies, and setting up surgery rooms and cleaning them afterward. *Solis,* 642 F.3d at 531. Thus, the Court concludes that the primary benefit of the externship flowed to Plaintiff, marking her relationship with Defendants that of an extern, not an employee." Id., at 1292

40.   These Plaintiffs have made no showing that they were in any fashion exploited sufficient to be transformed from students into employees. There are no facts which would support that transformation in light of the benefits they received from their educations. They have put all of their eggs into the "CAPA benefitted" basket. But that basket will not carry them because even if CAPA benefitted (which it did not), where, as here, the purposes of the education are achieved, a benefit to the education provider has repeatedly been found to be secondary to the benefit of a legitimate educational experience. See *Blair v. Wills,* 420 F. 3d., 823, (8th Cir. 2005) (even though students performed chores which helped school defray costs, students were not employees under FLSA because chores were integral part of the curriculum);

*Marshall v. Regis Educational Corp.,* 666 F.2d. 1324 (10th Cir. 1981) (student resident-hall assistants, although signatories with college to an "Employment Agreement", were not FLSA employees of private college, and "mere fact that the College may have derived some economic value from the RA program does not override the educational benefit of the program and is not dispositive of the 'employee' issue"). *Woods v. Wills,* 400 F.Supp.2d 1145 (E.D. Mo. 2005) (although using students as security guards defrayed school's costs, tasks were part of curriculum, taught self-respect and responsibility, and thus students were not employees); *Bobilin v. Bd. of Edu. Hawaii,* 403 F.Supp.1095 (D.C. HI. 1975) ("...it would be absurd for this Court to rule that any educational activity would be placed within the requirements of the FLSA simply because there may be a benefit to the institution involved," where students worked in cafeterias and clearly displaced regular workers.)

## CONCLUSION

Plaintiffs' motion for partial summary judgment does not appear to have been filed and served with the idea that Plaintiffs had a basis for a partial summary judgment ruling. Their "Undisputed Facts" from inception appeared designed to give the illusion that there are material issues of fact in this case. Whether these students are or are not employees is a question of law. *Kaplan, supra.,* at 834. The record in this case is now sufficiently crystallized for this Court to rule as a matter of law.  Plaintiffs' instant motion for partial summary judgment should be denied, and the Defendants' motions for final summary judgment are now due to be granted.

Respectfully submitted,

GRANT FRIDKIN PEARSON, P.A.

BY:   /s/  JEFFREY D. FRIDKIN
       Jeffrey D. Fridkin
       Florida Bar No. 0490245
       jfridkin@gfpac.com

21

5551 Ridgewood Drive, Suite 501
Naples, Florida 34108
(239) 514-1000
(239) 514-0377 (fax)

Attorneys for Defendant Collier Anesthesia, P.A.

**CERTIFICATE OF SERVICE**

I HEREBY certify that on March 28, 2014, I electronically served the foregoing to the

following:

Bradley P. Rothman, Esq.
WEDON & ROTHMAN, PL
7935 Airport Pulling Road N., Ste. 205
Naples, FL 34109
Telephone: (239) 262-21541
Facsimile: (239) 262-2342
brothman@weldonrothman.com
*Attorneys for Plaintiffs*

Tammie L. Rattray, Esq.
Bradley R. Hall, Esq.
FORD & HARRISON, LLP
101 E. Kennedy Blvd., Ste. 900
Tampa, FL 33602
Telephone: (813) 261-7828
Facsimile: (813) 261-7899
trattray@fordharrison.com
brhall@fordharrison.com
*Attorneys for Defendants, Wolford, Cook and Waterhouse*

Ryan D. Barack, Esq.
KWALL, SHOWERS & BARACK, P.A.
133 N. Fort Harrison Avenue
Clearwater, FL 33755
Telephone: (727) 441-4947
Facsimile: (727) 447-3158
rbarack@ksblaw.com
Jackie@ksblaw.com
*Co-Counsel for Plaintiffs*

By:___/s/ JEFFREY D. FRIDKIN___