UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

BILLY SCHUMANN, DUSTIN ABRAHAM, on behalf of themselves and others similarly situated, LAUREN TIDWELL, JEANIE HAKENEWERT, STEPHANIE ALANA MARIE BENJAMIN, CHRISTOPHER M. BOURN, DEREK WHITE, RICHARDO ROSADO, LANNETTE GIBSON, DANIEL PENTON, DENISE ARMINIO, OFELIA BIAGAN, SHEILA SMITH, CELINE VIDAURRI, CHRISTINA VINAS, RICARDO ROSADO, PATRICK C. HARRELL, RACHEL GOODE, JAMIESON WISHMAN, PAUL CALOIAN, JESSICA LINCOLN, and CHRISTOPHER JALACKI,

    Plaintiffs,

v.   Case No: 2:12-cv-347-FtM-29CM

COLLIER ANESTHESIA, P.A., a Florida corporation, WOLFORD COLLEGE, LLC, a Florida limited liability company, THOMAS L. COOK, an individual, and LYNDA M. WATERHOUSE, an individual,

    Defendants.

**OPINION AND ORDER**

This matter comes before the Court on (1) Defendant Collier Anesthesia, P.A.'s Amended Motion for Final Summary Judgment (Doc.

#181)[1] filed March 5, 2014, and Plaintiffs' Response (Doc. #205) filed March 28, 2014; (2) Defendants Wolford College, LLC, Thomas L. Cook, and Lynda M. Waterhouse's Dispositive Motion for Summary Judgment (Doc. #174) filed February 28, 2014, and Plaintiffs' Response (Doc. #204) filed March 28, 2014; and (3) Plaintiffs' Motion for Partial Summary Judgment (Doc. #173) filed February 28, 2014, and Defendants' Responses (Docs. ##200, 206) filed March 28, 2014.  For the reasons set forth below, Defendants' motions for summary judgment are granted and Plaintiffs' motion is denied.

## I.

Plaintiffs are twenty-five former student registered nurse anesthetists (SRNAs) who enrolled in Defendant Wolford College, LLC's (Wolford) nurse anesthesia master's degree program with the goal of becoming Certified Registered Nurse Anesthetists (CRNAs). While at Wolford, Plaintiffs participated as interns in a clinical training program supervised by Defendant Collier Anesthesia, P.A. (Collier).  Although it is undisputed that each plaintiff knew this was an unpaid internship program required for graduation, Plaintiffs now sue for payment of minimum wage and overtime compensation under the Fair Labor Standards Act (FLSA).  (Doc.

---

[1] Collier Anesthesia, P.A.'s initial Motion for Summary Judgment (Doc. #170) was filed on February 28, 2014.  The Amended Motion (Doc. #181) is identical to the earlier version with the exception of the insertion of previously-missing document numbers in citations to the record.

2

#1.) The Court conditionally certified a collective action (Doc. #91), and twenty-three additional former Collier interns joined the original two plaintiffs. (Doc. #176, ¶ 6; Doc. #197, ¶ 1.)

Each party now seeks summary judgment. Collier seeks a ruling that Plaintiffs were student trainees, not employees, and therefore are not entitled to compensation pursuant to the FLSA. (Doc. #181.) Wolford, Cook, and Waterhouse join Collier in that position, and also contend that, irrespective of that determination, they are entitled to summary judgment because Plaintiffs were in any event not *their* employees. (Doc. #174.) In addition, Wolford, Cook, and Waterhouse seek summary judgment on Plaintiffs' ability to recover punitive damages and the applicable statute of limitations. (Id.) Plaintiffs seek summary judgment on the trainee/employee issue, contending that they were employees of each Defendant within the meaning of the FLSA. (Doc. #173.)

**II.**

Summary judgment is appropriate only when the Court is satisfied that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "An issue of fact is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." Baby Buddies, Inc. v. Toys "R" Us, Inc., 611 F.3d 1308, 1314 (11th Cir. 2010). A fact is "material"

3

if it may affect the outcome of the suit under governing law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

In ruling on a motion for summary judgment, the Court views all evidence and draws all reasonable inferences in favor of the non-moving party. Scott v. Harris, 550 U.S. 372, 380 (2007); Tana v. Dantanna's, 611 F.3d 767, 772 (11th Cir. 2010). However, "if reasonable minds might differ on the inferences arising from undisputed facts, then the court should deny summary judgment." St. Charles Foods, Inc. v. America's Favorite Chicken Co., 198 F.3d 815, 819 (11th Cir. 1999) (quoting Warrior Tombigbee Transp. Co. v. M/V Nan Fung, 695 F.2d 1294, 1296-97 (11th Cir. 1983))(finding summary judgment "may be inappropriate where the parties agree on the basic facts, but disagree about the factual inferences that should be drawn from these facts")). "If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, then the court should not grant summary judgment." Allen v. Bd. of Pub. Educ., 495 F.3d 1306, 1315 (11th Cir. 2007).

## III.

The central issue is whether Plaintiffs were "employees" of Collier (and/or Wolford, Waterhouse, and Cook) and therefore entitled to minimum wages and overtime compensation pursuant to the FLSA. The determination of employment status under the FLSA

4

is a question of law, while the underlying facts and reasonable inferences therefrom are viewed in the light most favorable to the non-moving party. Scantland v. Jeffry Knight, Inc., 721 F.3d 1308, 1310-11 (11th Cir. 2013).

The wage and overtime protections of the FLSA only extend to "employees," a term which is "given rough outline by a series of broad definitions in the Act." Id. at 1311. The statute defines an "employee" as "any individual employed by an employer." 29 U.S.C. § 203(e)(1). In turn, the FLSA defines "employ" as "to suffer or permit to work," id. § 203(g), and an "employer" as "any person acting . . . in the interest of an employer in relation to an employee," id. § 203(d). To determine whether an individual is an "employee," courts look to the "economic reality" of all the circumstances in the relationship between the alleged employee and the alleged employer. Scantland, 721 F.3d at 1311. This inquiry is not governed by the label put on the relationship by the parties or the contract controlling that relationship, but "rather focuses on whether the work done, in its essence, follows the usual path of an employee." Id. To make this determination, courts have applied various multifactor tests as a guide, although the overarching focus remains the economic reality. Id. at 1311-12 (applying six factor test to distinguish employee from independent contractor); Kaplan v. Code Blue Billing & Coding, Inc., 504 F. App'x 831, 834 (11th Cir. 2013) (per curium), cert. denied, 134 S.

5

Ct. 618 (2013) (applying different six factor test to distinguish employee from trainee).

The Department of Labor's Wage and Hour Administrator has identified six factors-derived from the Supreme Court's decision in Portland Terminal-pertinent to determining whether a trainee qualifies as an employee under the FLSA. Kaplan, 504 F. App'x. at 834.

> Under the Administrator's test, a trainee is not an "employee" if these six factors apply:
>
> (1) the training, even though it includes actual operation of the facilities of the employer, is similar to that which would be given in a vocational school;
>
> (2) the training is for the benefit of the trainees;
>
> (3) the trainees do not displace regular employees, but work under close supervision;
>
> (4) the employer that provides the training derives no immediate advantage from the activities of the trainees and on occasion his operations may actually be impeded;
>
> (5) the trainees are not necessarily entitled to a job at the completion of the training period; and,
>
> (6) the employer and the trainees understand that the trainees are not entitled to wages for the time spent in training.

Id. at 834 n.2 (citing Wage & Hour Manual (BNA) 91:416 (1975)). While such multi-factor tests provide helpful guidance, courts must ensure that their "determination of the relationship does not depend on such isolated factors but rather upon the circumstances of the whole activity." Rutherford Food Corp. v. McComb, 331 U.S.

722, 730 (1947). This is especially true where, as here, the hybrid student-trainee nature of Plaintiffs' clinical experience renders rigid adherence to any particular test impractical. See Solis v. Laurelbrook Sanitarium & Sch., Inc., 642 F.3d 518, 525-26 (6th Cir. 2011) (holding that when training takes place in an educational setting, the analysis should focus on "which party receives the primary benefit of the work performed by [the] students"). Accordingly, utilizing the Kaplan factors as a guide, the Court's determination of the economic realities in this case is as follows.[2]

1.  **Training similar to that which would be given in a vocational school.**

This factor is satisfied if "the training provided was similar to that which would be given in school and was related to Plaintiffs' course of study." Kaplan, 530 F. App'x at 835. It is undisputed that Wolford is accredited by the Council on Accreditation of Nurse Anesthesia Educational Programs (COA), (Doc. #173, pp. 4-5; Doc. #206, p. 4), and that Plaintiffs attended Wolford to become CRNAs. (See, e.g., Doc. #177-3, p. 31; Doc. #178-2, p. 264; Doc. #179-53, p. 135.) To become a CRNA, each Plaintiff had to obtain his or her master's degrees from Wolford,

---

[2] On April 18, 2014, Defendants filed Rule 56(c)(2) Objections to Cited Material in Plaintiff's Response to Motion for Summary Judgment. (Doc. #213.) The Court need not rule on those objections at this time because the Court concludes, based on the entirety of the record, that Defendants are entitled to summary judgment even if their objections were overruled.

7

complete COA-mandated clinical training requirements, and pass a certification exam. (Doc. #169-2, p. 2; Doc. #175-1, ¶ 7.) Plaintiffs' time at Collier served as the COA-required clinical portion of their master's degree program. (See Doc. #175-3.) Plaintiffs received academic credit and grades for their clinical time, which allowed them to graduate and sit for the nurse anesthesia certification exam. (See, e.g., Doc. #178-1, pp. 19-23; Doc. #179-14, pp. 26-29; Doc. #179-33, pp. 18-21.) Thus, Plaintiffs' training at Collier was "similar to that which would be given in a vocation school" in that it was a key component of Plaintiffs' master's degree program and was required by the field's national accreditation body.

Plaintiffs' contention that a portion of their time at Collier consisted of stocking carts, filling out pre-operative forms, and performing other work typically reserved for lower-level "anesthesia techs," (Doc. #205, p. 4; Doc. #204-10, ¶¶ 4-5; Doc. #173-17, ¶ 6), does not change this determination. Defendants' expert contends that such work is part of a CRNA's everyday activities (Doc. #169-2, p. 4), but even if this is incorrect and a CRNA is a job which requires absolutely no ministerial activities, the activities Plaintiffs say they performed are at the very least "related" to Plaintiffs' course of study, which is sufficient under Kaplan. 530 F. App'x at 835. Accordingly, there is no genuine issue of material fact that this factor is satisfied.

8

**2.   Training for the benefit of the trainees.**

This criterion is satisfied if trainees "received academic credit for their work and . . . satisfied a precondition of graduation." <u>Kaplan</u>, 504 F. App'x at 835. As explained above, it is uncontested that Plaintiffs received academic credit for their clinical training at Collier, which was not only a precondition for graduation, but also a COA requirement and a prerequisite for CRNA certification. (<u>See, e.g.</u>, Doc. #178-1, pp. 19-23; Doc. #179-14, pp. 26-29; Doc. #179-33, pp. 18-21.) Accordingly, there is no genuine issue of material fact that this factor is met.

**3.   Trainees displace regular employees and work under close supervision.**

Plaintiffs' contend that Collier used SRNAs as replacements for CRNAs and that SRNAs were not closely supervised. In support of their displacement allegations, Plaintiffs rely on the testimony of Barbara Rose (Rose), a former Collier administrative assistant responsible for CRNA scheduling. (Doc. #173-12, pp. 6-11.) Rose, recalling conversations she had with Cook, testified that, due to the fact that a patient must be attended by an anesthesiologist (MD), CRNA, or SRNA at all times, if SRNAs were not available to attend to a particular patient, a CRNA or MD would have to be staffed instead. (Doc. #173-12, pp. 41-43; Doc. #173-13, pp. 137-138). Likewise, if Collier did not have SRNAs, CRNAs would have to be scheduled for the overnight on-call shifts that were typically assigned to SRNAs. (Doc. #173-12. p. 130.) Rose

9

also recalled instances where she was instructed to tell CRNAs to stay home so that SRNAs could work in their place. (Doc. #173-13, pp. 185-93.) Thus, according to Rose, without SRNAs, Collier would have either hired additional CRNAs or increased the hours of existing CRNAs. (Doc. #173-12, pp. 62-67, 98-104.)

Regarding supervision, Plaintiffs contend that they performed a variety of tasks unsupervised, such as stocking carts and bins, drawing medications, and completing pre-operative forms and evaluations. (See, e.g., Doc. #204-10, ¶¶ 4-6.) A former clinical instructor at Collier confirmed that SRNAs performed these tasks without direct supervision (Doc. #173-18, p. 53; Doc. #173-19, pp. 84-87, 104-06.)

In response to Plaintiff's displacement allegations, Defendants contend that Rose's testimony is deficient because she was not privy to Collier's financial or payroll information, and therefore could not know whether SRNAs actually displaced CRNAs. (Doc. #173-13, pp. 148-54.) Further, Cook denies that the scheduling discussions Rose recalled in her testimony ever happened. (Doc. #199-1, ¶¶ 4-10.) To the contrary, Defendants point to the fact that both the number of CRNAs employed by CAPA and the payroll cost for those CRNAs remained relatively consistent throughout the relevant time period despite year-to-year fluctuations in the number of SRNAs. (See Doc. #173-7, Ex. 2.)

10

Concerning SRNA supervision, Defendants emphasize that supervising MDs and CRNAs were in close proximity to SRNAs, were always accessible via electronic radios, were always physically present during procedures, and reviewed SRNA work. (Doc. #172, ¶¶ 3-5; Doc. #173-9, p. 141-43; Doc. #175-1, ¶¶ 14-19.) Similarly, the same clinical instructor who confirmed that SRNAs performed pre-operative work without direct supervision testified that SRNAs were supervised more closely than CRNAs, that CRNAs or MDs would review unsupervised work to ensure that it was done correctly, and that MDs were always available should SRNAs have any questions. (Doc. #173-18, p. 53-55; Doc. #173-19, pp. 84-87, 105) In essence, Defendants contend that in providing SRNAs the clinical training required by COA to prepare them for solo practice, some autonomous activity is inevitable, but that does not mean SRNAs were not closely supervised. (Doc. #172, ¶¶ 4-5.)

It is undisputed that Plaintiffs were allowed to perform at least some tasks autonomously without MD or CRNA supervisors close by. Additionally, Rose testified that SRNAs displaced CRNAs on at least some occasions. While Defendants argue that the level of SRNA autonomy was minimal, and contest the accuracy of Rose's testimony, there are genuine issues of material fact bearing on this factor. Accordingly, for the purposes of evaluating their respective motions for summary judgment, neither side can successfully claim this factor.

**4. Immediate advantage to employer.**

Plaintiffs contend that SRNA clinical training benefitted Collier because Collier used SRNAs to replace CRNAs, thereby reducing staffing and payroll while maintaining or increasing billings. In support of this contention, Plaintiffs again rely on Rose's testimony that SRNAs were used to reduce CRNA staffing. (Doc. #173-12, pp. 41-43, 130; Doc. #173-13, pp. 137-138). Rose was not a clinician, was never privy to Collier's financial or payroll information, and had no knowledge regarding the supervision of SRNAs. (Doc. #173-13, pp. 148-54.) Accordingly, while Rose's testimony suggests potential benefits to Collier, she could not, and did not, testify as to whether SRNAs provided an *overall* immediate benefit or detriment to Collier.

To the contrary, Cook (Collier's President) and Waterhouse (Collier's Executive Director and one of its designated corporate representatives) provided uncontradicted testimony on this issue. Cook, while acknowledging (as Rose did) that SRNAs performed work that otherwise would have been completed by CRNAs (Doc. #173-4, pp. 117-121), explained that Collier does not derive any immediate benefit from SRNA trainees because the supervision process impedes the work of the supervising MDs and CRNAs. (Doc. #172 ¶¶ 3, 5; Doc. #173-4, pp. 113-20.) Defendants' expert, Kenneth M. Kirsner, noted that such inefficiencies are common throughout SRNA clinical programs. (Doc. #169-2, pp. 5-6.) Likewise, when questioned concerning Plaintiffs' central allegation—that SRNAs created value

12

for Collier by allowing Collier to substitute unpaid SRNAs for paid CRNAs while maintaining the same billings—Waterhouse unequivocally stated that "[w]e don't save on labor costs. We lose money on the students." (Doc. #173-7, p. 85.) Similarly, Waterhouse explained that creating and maintaining the clinical program was a detriment to Collier due the need to find appropriate clinical sites and convince MDs and CRNAs to take on the extra stress and added work necessary to teach SRNAs. (Doc. #173-6, pp. 111-12.) A former Collier MD clinical instructor agreed, explaining that while SRNAs spent considerable time on preparatory activities as part of their clinical training, "[i]n the hands of a competent nurse anesthetist and anesthesiologist, you can be ready to start a case in five minutes. So the students made absolutely no difference." (Doc. #173-19, pp. 93-94.) As a result, Waterhouse explained that Collier accepts SRNAs for two reasons only: to support CRNA education and as a recruiting tool. (Doc. #173-6, p. 108; Doc. #173-7, pp. 81-82.)

There are genuine issues of material fact bearing on this factor. Accordingly, for the purposes of evaluating their respective motions for summary judgment, neither side can successfully claim this factor.

**5.   Trainees not necessarily entitled to a job at the completion of the training period.**

It is undisputed that Plaintiffs were not entitled to a job at Collier at the completion of their clinical training period, as

13

Plaintiffs admit that Collier does not promise employment to its SRNAs. (Doc. #173, p. 23.) Accordingly, there is no genuine issue of material fact that this factor is met.

### 6. Employer and the trainees understand that the trainees are not entitled to wages for the time spent in training.

Plaintiffs concede that "[i]t is undisputed that there was at no time an understanding between Plaintiffs and Defendants that Plaintiffs were to receive wages for their work," (Doc. #163, p. 8 n.6.), and that Plaintiffs made "pre-employment acknowledgement[s] not to be compensated." (Doc. #204, p. 34.) Additionally, Plaintiffs' deposition testimony confirms that they did not expect compensation. (Doc. #178-1, p. 94; Doc. #179-1, p. 71; Doc. #179-14, pp. 63-64; Doc. #179-34, pp. 35-36; Doc. #179-53, p. 138; Doc. #179-75, pp. 59-60.) Accordingly, there is no genuine issue of material fact that this factor is met.

The Court concludes that the economic realities of this case establish that Plaintiffs were not "employees" of any Defendant, and therefore are not entitled to wage or overtime compensation. Plaintiffs were students enrolled in a master's degree program at an accredited college. The graduation requirements for their master's degree required participation in the internship, as did the accrediting body for the college. Plaintiffs were given the hands-on training required to obtain their nurse anesthesia master's degrees and to sit for the CRNA certification exam. Each Plaintiff knew and acknowledged that he or she would not be paid

14

for the internship, and each received course credit and a grade for the internship. The internship provided clear benefits to Plaintiffs, although the nature and extent of any benefit to Defendants is disputed. None of the Plaintiffs were entitled to, or thought they would be entitled to, employment at Collier upon completion of the internship. As explained in Kaplan, even if a training program is "of little educational benefit," student trainees are not employees for the purposes of the FLSA if the trainees "did in fact engage in hands-on work for their formal degree program . . . received academic credit for their work and, by completing [training] were eligible to earn their degrees." 504 F. App'x at 834. Upon review of the totality of the evidence, the Court finds that Plaintiffs' work at Collier was clinical training performed as students, not as employees. Accordingly, Plaintiffs were not Defendants' employees for the purposes of the FLSA.[3]

Accordingly, it is now

**ORDERED:**

1. Plaintiffs' Motion for Partial Summary Judgment (Doc. #173) is **DENIED.**

---

[3] As a result, the Court need not address the separate grounds for summary judgment raised by Wolford, Cook, and Waterhouse.


2. Defendants' Motions for Summary Judgment (Docs. ##174, 181) are **GRANTED,** judgment is entered in favor of Defendants, and Plaintiffs shall take nothing.

3. The Clerk shall enter judgment accordingly, terminate as moot all pending motions other than Defendants Thomas L. Cook and Lynda Waterhouse's Opposed Motion for Entitlement to Attorneys' Fees and Costs (Doc. #223), terminate all deadlines as moot, and close the file.

**DONE AND ORDERED** at Fort Myers, Florida, this __23rd__ day of May, 2014.

```
          /s/ John E. Steele
          JOHN E. STEELE
          UNITED STATES DISTRICT JUDGE
```

Copies: Counsel of record