UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

BILLY SCHUMANN, DUSTIN
ABRAHAM, on behalf of
themselves and others
similarly situated, LAUREN
TIDWELL, JEANIE HAKENEWERT,
STEPHANIE ALANA MARIE
BENJAMIN, CHRISTOPHER M.
BOURN, DEREK WHITE, LAHOMA
J. NACHTRAB, RICHARDO
ROSADO, LANNETTE GIBSON,
DANIEL PENTON, DENISE
ARMINIO, OFELIA BIAGAN,
SHEILA SMITH, CELINE
VIDAURRI, CHRISTINA VINAS,
RICARDO ROSADO, PATRICK C.
HARRELL, RACHEL GOODE,
JAMIESON WISHMAN, PAUL
CALOIAN, STEVEN TODD LITTLE,
JESSICA LINCOLN, and
CHRISTOPHER JALACKI,

       Plaintiffs,

v.                     Case No: 2:12-cv-347-FtM-29CM

COLLIER ANESTHESIA, P.A., a
Florida corporation, WOLFORD
COLLEGE, LLC, a Florida
limited liability company,
THOMAS L. COOK, an
individual, and LYNDA M.
WATERHOUSE, an individual,

       Defendants.

_____

**OPINION AND ORDER**

This matter comes before the Court on (1) Defendant Collier

Anesthesia, P.A.'s Supplemental Motion for Final Summary Judgment

(Doc. #248) filed November 16, 2015 and Plaintiffs' Response (Doc.

#256) filed December 16, 2015; (2) Defendants Wolford College,

LLC, Thomas L. Cook, and Lynda M. Waterhouses' Supplemental

Dispositive Motion for Summary Judgment (Doc. #249) filed November 16, 2015 and Plaintiffs' Response (Doc. #257) filed December 16, 2015; and (3) Plaintiffs' Supplemental Motion for Partial Summary Judgment (Doc. #251) filed November 17, 2015, Defendants' Responses (Docs. ## 258, 259) filed December 16, 2015, and Plaintiffs' Reply (Doc. #264) filed February 5, 2016. For the reasons set forth below, all three motions are denied.

## I.

A court may grant summary judgment only if satisfied that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it goes to "a legal element of the claim under the applicable substantive law" and thus may impact the case's outcome. Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997). "An issue of fact is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256, 1260 (11th Cir. 2004).

"The burden of establishing that there is no genuine issue of material fact lies with the moving party." Walker v. Darby, 911 F.2d 1573, 1576 (11th Cir. 1990) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986)). "[O]nce the moving party has met that burden by presenting evidence which, if uncontradicted, would entitle it to a directed verdict at trial," the party opposing summary judgment must "set forth specific facts showing that there is a genuine issue for trial. A mere 'scintilla' of evidence

supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." Id. at 1576-77. In ruling on the motion, the court must view all evidence and draw all reasonable inferences in favor of the non-moving party. Scott v. Harris, 550 U.S. 372, 380 (2007); Tana v. Dantanna's, 611 F.3d 767, 772 (11th Cir. 2010).

Summary judgment should be denied not just where the parties disagree on issues of material fact, but also "where the parties agree on the basic facts, but disagree about the factual inferences that should be drawn from these facts." Warrior Tombigbee Transp. Co. v. M/V Nan Fung, 695 F.2d 1294, 1296 (11th Cir. 1983); see also Allen v. Bd. of Pub. Educ., 495 F.3d 1306, 1315 (11th Cir. 2007) ("If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, then the court should not grant summary judgment."). Put simply, if the resolution of a material fact or the inference to be drawn therefrom presents a "he said, she said" scenario, and if the record has evidence genuinely supporting both sides of the story, then summary judgment is not appropriate.

## II.

Plaintiffs are twenty-five former student registered nurse anesthetists (SRNAs) who enrolled in Defendant Wolford College, LLC's (Wolford) 28-month nurse anesthesia master's program seeking to become well-compensated Certified Registered Nurse Anesthetists (CRNAs). While students at Wolford, Plaintiffs participated as

interns in a clinical training program supervised and subsidized by Defendant Collier Anesthesia, P.A. (Collier). Though it is undisputed that Plaintiffs knew the internship was unpaid and that completing it was required to graduate, Plaintiffs now claim they functioned as "employees" while at the clinical sites and seek to recover minimum wage and overtime compensation under the Fair Labor Standards Act (FLSA), 29 U.S.C. § 201 et seq. The Complaint names as defendants both Collier and Wolford, as well as Dr. Thomas L. Cook (Dr. Cook), Wolford's Chairman and Collier's President, and Lynda M. Waterhouse (Ms. Waterhouse), Wolford's Chief Financial Officer and Collier's Executive Director. The Court conditionally certified a collective action (Doc. #91), and twenty-three former Collier SRNA interns joined the two original plaintiffs. (Docs. ## 176, ¶ 6; 197, ¶ 1.)

On May 23, 2014, the Court issued an Opinion and Order (Doc. #226) granting both defense motions for summary judgment (Docs. ## 174, 181) and denying Plaintiffs' Motion for Partial Summary Judgment (Doc. #173). Using the six-factor trainee/employee test set forth by the Department of Labor (DOL) and discussed in Kaplan v. Code Blue Billing & Coding, Inc., 504 Fed. App'x 831 (11th Cir. 2013) (per curiam) as a guide, the Court concluded that "[u]pon review of the totality of the evidence, . . . Plaintiffs' work at Collier was clinical training performed as students, not as employees." (Doc. #226, p. 15.) To reach this conclusion, the Court specifically considered whether Plaintiffs: 1) were provided training similar to that which would be given in school and which

- 4 -

was related to their course of study; 2) received academic credit for their work, and the work satisfied a precondition of graduation; 3) displaced other employees and worked under close supervision; 4) provided Collier with an overall immediate benefit through their work as SRNAs; 5) were promised or entitled to jobs at the completion of their clinical training period; and 6) were promised or expected to receive wages or other compensation for their clinical training. Although the Court found genuine issues of material fact bearing on the third and fourth factors, the other four factors unquestionably weighed in Defendants' favor. Accordingly, the Court concluded that "the economic realities of this case establish[ed] that Plaintiffs were not 'employees' of any Defendant," foreclosing any viable claim for unpaid minimum or overtime wages under the FLSA.[1]   (Id. p. 14.)

On appeal, the Eleventh Circuit vacated summary judgment and remanded the case for further proceedings. Schumann v. Collier Anesthesia, P.A., 803 F.3d 1199 (11th Cir. 2015). The Circuit Court declined to "take a position at this time regarding whether [Plaintiffs] were 'employees' for purposes of the FLSA." Id. at 1215. Rather, it concluded that the six-factor "economic realities" test this Court had applied – which was derived from

---

[1] The Court did not reach the three additional arguments raised by Wolford, Dr. Cook, and Ms. Waterhouse (the Wolford Defendants): 1) if Plaintiffs were "employees," their only "employer" was Collier; 2) there is no basis for a claim of liquidated damages under the FLSA; and 3) there was no "willful FLSA violation," as is needed to support a three-year statute of limitations. These arguments are reasserted in the Wolford Defendants' Supplemental Dispositive Motion for Summary Judgment and addressed herein.

the Supreme Court's decision in Walling v. Portland Terminal, Co., 330 U.S. 148 (1947) - is outdated and ill-suited for the twenty-first century educational internship.  Schumann, 803 F.3d at 1211 ("Longer-term, intensive modern internships that are required to obtain academic degrees and professional certification and licensure in a field are just too different from the short training class offered by the railroad in Portland Terminal for the purpose of creating its own labor pool.").

The Eleventh Circuit took particular issue with Portland Terminal's "no immediate advantage" factor, which does not accommodate the symbiotic nature of the modern-day internship. See id. ("We cannot realistically expect anesthesiology practices to expose themselves to these costs by providing students with the opportunity to participate in 550 cases each, without receiving some type of benefit from the arrangement." (citing Donovan v. Am. Airlines, Inc., 686 F.2d 267, 272 (5th Cir. 1982))).  While observing that "there is nothing inherently wrong with an employer's benefiting from an internship that also plainly benefits the interns," the Circuit Court did find problematic "the potential for some employers to maximize their benefits at the unfair expense and abuse of student interns."  Id.

The resultant Schumann approach tailors Portland Terminal's primary beneficiary test "to account for the unique qualities of the type of internship at issue in this case."  Id. at 1203.  Under this approach, "the mere fact that an employer obtains a benefit from providing a clinical internship does not mean that the

- 6 -

employer is the 'primary beneficiary' of the relationship." Id. at 1213.  Instead, the court is to "focus on the benefits to the student while still considering whether the manner in which the employer implements the internship program takes unfair advantage of or is otherwise abusive towards the student." Id. at 1211.

The starting point for the primary beneficiary analysis in the modern-internship context is the list of seven factors recently set forth by the Second Circuit in Glatt v. Fox Searchlight Pictures, Inc., 791 F.3d 376 (2d Cir. 2015), opinion amended and superseded, 811 F.3d 528 (2d Cir. 2016), a case involving FLSA wage claims brought by students working unpaid college internships in film production.  The aptly-named "Glatt factors" consider:

> 1.  The extent to which the intern and the employer clearly understand that there is no expectation of compensation.  Any promise of compensation, express or implied, suggests that the intern is an employee — and vice versa.
>
> 2.  The extent to which the internship provides training that would be similar to that which would be given in an educational environment, including the clinical and other hands-on training provided by educational institutions.
>
> 3.  The extent to which the internship is tied to the intern's formal education program by integrated coursework or the receipt of academic credit.
>
> 4.  The extent to which the internship accommodates the intern's academic commitments by corresponding to the academic calendar.
>
> 5.  The extent to which the internship's duration is limited to the period in which

> the internship provides the intern with
> beneficial learning.
>
> 6.  The extent to which the intern's work
>     complements, rather than displaces, the
>     work of paid employees while providing
>     significant educational benefits to the
>     intern.
>
> 7.  The extent to which the intern and the
>     employer understand that the internship is
>     conducted without entitlement to a paid
>     job at the conclusion of the internship.

Id. at 1211-12 (citing Glatt, 791 F.3d at 384).

Under this "flexible" approach, "[n]o one factor is dispositive and every factor need not point in the same direction for the court to conclude that the intern is not an employee . . . ." Id. (citing Glatt, 791 F.3d at 384). Where appropriate, courts may also take into account "other considerations not expressed in the seven factors." Id. Moreover, and particularly relevant here, "a court may elect in certain cases, including cases that can proceed as collective actions, to consider evidence about an internship program as a whole rather than the experience of a specific intern."[2] Glatt, 811 F.3d at 537.

Although application of the Glatt factors may reveal a sole primary beneficiary of the internship, it is not necessarily "an all-or-nothing determination." Schumann, 803 F.3d at 1214. That is, it may be that "a portion of the student's efforts constitute

---

[2] This language comes from the amended (post-Schumann) version of Glatt, which, among other revisions, replaces several references to "the intern" with the words "the internship." For example, the phrase "whether and what type of training the intern received," 791 F.3d 386, was changed to "whether and what type of training the internship program provided." 811 F.3d at 539.

a *bona fide* internship that primarily benefits the student," while other efforts primarily benefit the employer – for example, where the employer capitalizes on "the student's need to complete the internship by making continuation of the internship implicitly or explicitly contingent on the student's performance of tasks or his working of hours well beyond the bounds of what could fairly be expected to be a part of the internship." Id. at 1214-15.

The Court now turns to whether summary judgment is warranted under Schumann. Given the systemic nature of the allegations in this collective action, the Court finds it appropriate to consider Collier's SRNA "internship program as a whole" when evaluating Plaintiffs' claims. Glatt, 811 F.3d at 537. Before doing so, however, the Court addresses the Wolford Defendants' argument that, if Plaintiffs were "employees" under the FLSA, only Collier may be held liable as their "employer."

### III.

**A.   Plaintiffs' Potential "Employers"**

Plaintiffs seek to hold all four named Defendants liable for the FLSA wage violations alleged in the Complaint.  Wolford, Dr. Cook, and Ms. Waterhouse contend that, even if Plaintiffs were "employees" within the meaning of the FLSA, Collier was Plaintiffs' only "employer," and thus summary judgment of Plaintiffs' claims should be entered in their favor.

The FLSA defines "employer" as "any person acting directly or indirectly in the interest of an employer in relation to an employee," 29 U.S.C. § 203(d), and "'person' means an individual,

partnership, association, corporation, business trust, legal representative, or any organized group of persons." Id § 203(a). Thus, "[a]side from the corporate entity itself, a company's owners, officers, or supervisory personnel may also constitute 'joint employers' for purposes of liability under the FLSA." Thompson v. Real Estate Mortg. Network, 748 F.3d 142, 153 (3d Cir. 2014); see also Layton v. DHL Exp. (USA), Inc., 686 F.3d 1172, 1175 (11th Cir. 2012) (observing that "[a]n employee may have more than one employer" under the FLSA). "The term 'employer' is not limited to the narrow or technical concepts of employment but rather is given a broad meaning to carry out the [protective] purpose of the Act." Donovan v. Am. Leader Newspapers, Inc., 524 F. Supp. 1144, 1146 (M.D. Fla. 1981) (citations omitted).

**1) Wolford College, LLC**

Wolford claims it was not an "employer," while Plaintiffs argue Wolford may be held liable under a "joint employment" theory. The hallmark of the joint-employment analysis is "the economic reality of all the circumstances." Layton, 686 F.3d at 1177 (quotation omitted). "[W]hether a party qualifies as a joint employer for liability purposes depends on whether 'as a matter of economic reality, the individual is dependent on the entity.'" Cornell v. CF Ctr., LLC, 410 F. App'x 265, 268 (11th Cir. 2011) (per curiam) (quoting Antenor v. D & S Farms, 88 F.3d 925, 929 (11th Cir. 1996)). This inquiry "turns on no formula, but the court will consider factors such as control, supervision, right to hire and fire, ownership of work facilities, investment, and pay-

roll decisions," id. (citing Antenor, 88 F.3d at 932-37), to the extent these factors "shed light on the existence of economic dependence" in the particular case. Layton, 686 F.3d at 1181.

The Court finds the factor of control particularly relevant here. Wolford controlled which students were admitted to the SRNA master's program. It was also responsible for assigning students to carry out the clinical portion of their program with Collier Anesthesia (as opposed to a different anesthesia group) and for changing those assignments. (Doc. #179-1, pp. 22-23 (85-86).)[3] While the parties dispute whether it was Collier or Wolford who, in practice, created the SRNAs' clinical schedules, the affiliation agreement in place between Collier and Wolford assigned Wolford that duty. (Doc. #173-27, p. 2.) Dr. John Nolan testified that it was Wolford, not Collier, who "put [the students] on call[] . . . because Wolford is the one that controls the students." (Doc. #173-16, p. 12.) It was Wolford who required SRNAs to report to their assigned clinical site before their shift started. (Id. p. 31.) When students sought to change their rotational assignments, they approached Wolford personnel. (Doc. #177-3, p. 14 (54).) Wolford formally disciplined students for substandard clinical performance by placing them on probation or dismissing them from the program. (Docs. ## 179-2, pp. 6, 8 (115-

---

[3] For deposition transcripts containing four transcript pages per one .pdf page, the first page number cited refers to the .pdf page number, and the page number in parentheses refers to the deposition transcript page number. For single-page .pdf transcripts, the page number cited refers to the .pdf page.

16, 122-23); 179-12.)  And it was Wolford's policies that required clinical training to occur on days school was "out of session," as the Court will discuss below.  These factors, and perhaps others,[4] prevent summary judgment in Wolford's favor on whether Wolford was a "joint employer."  See Antenor, 88 F.3d at 933 (considerations like who determines when workers should begin and end their work day, the tasks to which workers should be assigned, and whether to discipline a worker are relevant "control" factors); see also Falk v. Brennan, 414 U.S. 190, 195 (1973) (under the FLSA's "expansive" definition of "employer," one who has "substantial control of the terms and conditions of the work of the[] employees[] . . . [is] an 'employer'").

### 2)  Dr. Cook and Ms. Waterhouse

Dr. Cook is Collier's President and a Collier partner/shareholder.  (Doc. #173-3, pp. 13, 26.)  Ms. Waterhouse is Collier's Executive Director and manages its finances and business operations.  (Doc. #173-5, pp. 15-16.)  Both seek summary judgment on Plaintiffs' FLSA claims against them individually, arguing that "individuals ordinarily are shielded from personal liability when they do business in a corporate form."  (Doc. #174, p. 46 (quoting Lamonica v. Safe Hurricane Shutters, Inc., 711 F.3d

---

[4] In assessing economic dependence, courts also consider whether the work was "integral" to the business of the entity eschewing "employer" status.  Antenor, 88 F.3d at 937; Garcia-Celestino v. Ruiz Harvesting, Inc., No. 2:10-CV-542-FTM-38, 2013 WL 3816730, at *12 (M.D. Fla. July 22, 2013).  Wolford was founded to provide Collier with a ready CRNA labor pool, and in fact, 99% of Collier's CRNAs are Wolford graduates.  (Doc. #173-16, pp. 41-42.)

1299, 1313 (11th Cir. 2013)).)   Though generally true, this shield does not protect corporate officers and directors "with operational control of a corporation's covered enterprise." Patel v. Wargo, 803 F.2d 632, 637-38 (11th Cir. 1986) (citations omitted); see also Lamonica, 711 F.3d at 1310.   In the context of an FLSA claim asserted against an officer or director doing business in the corporate form, the "economic reality" test just discussed looks at the individual's "ownership interest in the corporation and control over the corporation's day-to-day functions." Lamonica, 711 F.3d at 1313; see also Manning v. Boston Med. Ctr. Corp., 725 F.3d 34, 47 (1st Cir. 2013).

Dr. Cook and Ms. Waterhouse argue they should not be held individually liable for Collier's potential FLSA violations because neither was "in charge of [Collier's] day-to-day operations, as the various medical sites had their own department chairman responsible for [that]."[5]   (Doc. #174, p. 48.)   This claim is undermined by the testimony of Dr. Daniel Janyja, a Collier anesthesiologist.[6]   Even if true, it is not dispositive of the issue of individual liability.   "[O]ne can be involved in

---

[5] Dr. Cook and Ms. Waterhouse have not requested summary judgment as to their individual liability for Wolford's potential FLSA violations.   Both are Wolford shareholders who appear to have exercised substantial control over Wolford's day-to-day operations as, respectively, the school's Chairman and Chief Financial Officer.

[6] When asked "who managed the day-to-day operations of Collier Anesthesia" with respect to its "business decisions," Dr. Janyja answered: "That's done in the office with Tom Cook and Lynda Waterhouse . . . ."   (Doc. #173-10, p. 19.)

- 13 -

'day-to-day' (i.e., regular) operations on an intermittent basis.
. . . [T]he fact that control was exercised only occasionally does
not diminish the significance of its existence." Lamonica, 711
F.3d at 1314 (quotation omitted).

Viewed in the light most favorable to Plaintiffs, the Court
finds sufficient evidence from which a reasonable jury could
conclude that Dr. Cook and Ms. Waterhouse "exercised enough
control" over Collier's "regular" operations - the administration
of anesthesia to patients, which operation routinely involved
Wolford SRNAs - "to play a substantial role in causing" the alleged
FLSA violations and expose them to individual liability as
Plaintiffs' employers. Id. For example, the manner in which
SRNAs were scheduled is central to Plaintiffs' claim that they
were "employees." The person allegedly responsible for that
scheduling was Barbara Rose, a former Collier employee. She
testified that it was Ms. Waterhouse who trained her on how to
incorporate the financially-advantageous "QZ" billing code
(discussed below) into the scheduling process. (Doc. #173-12, pp.
33-34.) Dr. Cook is one of the individuals who, according to Ms.
Rose, reviewed and either approved of or requested modifications
to the SRNA schedules. (Docs. ## 173-8, p. 46; 173-12, pp. 36,
46; 173-13, pp. 91-93.) This testimony provides a sufficient
basis for denying the Wolford Defendants' request for summary
judgment on Plaintiffs' claims of individual liability against Dr.
Cook and Ms. Waterhouse. See Lamonica, 711 F.3d at 1313 (observing

that control over the plaintiff may be inferred from "the exercise of control over other employees").

**B.    The "Felony" Red Herring**

The Court also finds it prudent to address a recurring theme in Defendants' briefing: that because performing CRNA duties without a license is a felony in Florida under Fla. Stat. § 464.016(1)(a), Plaintiffs should be estopped from claiming they were "employees" under the FLSA. However, the estoppel doctrine cannot be used to preclude an FLSA claim. Edmund v. City of Fort Myers, No. 2:10-CV-474-FTM-29, 2012 WL 28224, at *7 (M.D. Fla. Jan. 5, 2012) ("Generally speaking, estoppel is not a recognizable defense under the FLSA."). Were that not the case, those who run internship programs, particularly in regulated industries, would have carte blanche "to maximize their benefits at the unfair expense and abuse of student interns" – precisely what Schumann aims to prevent. Schumann, 803 F.3d at 1211. The estoppel argument also ignores that, in determining whether a student intern was an "employee," the Glatt factors and Schumann focus on the putative *employer's* conduct. In other words, a student intern is deemed an "employee" because he was treated as such. Accordingly, Section 464.016(1)(a) is not relevant to the Court's FLSA analysis.[7]

---

[7] Defendants ignore that, under Section 464.016(1)(b), "knowingly *employing* an unlicensed person to engage in CRNA duties constitutes a felony" as well. Schumann, 803 F.3d at 1203 (emphasis added).

C.   **Applying the <u>Glatt</u> Factors to the Factual Record**

   1)   <u>Glatt</u> **Factors One and Seven - Promise or Expectation of Compensation or Future Employment**

   There is no genuine issue of material fact respecting the first and seventh <u>Glatt</u> factors: Plaintiffs concede they were not expressly or impliedly promised compensation for their clinical internships, nor were they promised a CRNA job with Collier upon graduation.  Accordingly, these two factors favor Defendants.

   2)   <u>Glatt</u> **Factor Two - Similarity of Clinical Training to Classroom Experience**

   The second <u>Glatt</u> factor requires the Court to consider the extent to which Collier's internship program provided training similar to what students receive in school.  The more similar an internship experience to a classroom setting, the more this factor weighs against finding that student interns were employees, and vice versa.[8]

   In their Supplemental Motion for Summary Judgment, Plaintiffs argue that the second <u>Glatt</u> factor indisputably weighs in their

---

[8] In evaluating this factor, district courts have considered the level of mentorship provided during the internship, <u>Mark v. Gawker Media LLC</u>, No. 13-CV-4347(AJN), 2016 WL 1271064, at *10 (S.D.N.Y. Mar. 29, 2016); the degree of supervision over the intern's work, <u>Wang v. Hearst Corp.</u>, No. 12-CV-0793(JPO), 2016 WL 4468250, at *6 (S.D.N.Y. Aug. 24, 2016); whether the internship provided valuable "hands-on training," <u>id.</u>; the amount of time spent on "rote" tasks (i.e. grunt work), <u>id.</u>; <u>Gerard v. Mitchell Sys.</u>, No. CV 14-4999 DSF (SHX), 2016 WL 4479987, at *6 (C.D. Cal. Aug. 22, 2016); whether the clinical work was "consistent with what is ***statutorily required*** to be performed at [that type of] school," <u>Hollins v. Regency Corp.</u>, 144 F. Supp. 3d 990, 999 (N.D. Ill. 2015); and "whether the students' educational goals were subordinated to Defendant's business interests in generating revenue." <u>Guy v. Casal Inst. of Nev., LLC</u>, No. 213CV02263RFBGWF, 2016 WL 4479537, at *5 (D. Nev. Aug. 23, 2016).

favor because: a) Collier SRNAs were subjected to verbal abuse and inappropriate physical contact; b) the students displaced paid workers; c) the training the students received did not comply with educational requirements; and d) the students were required to perform tasks that had little or no educational value.  In its previous summary judgment order, this Court concluded - as a matter of law - that the training Collier provided Plaintiffs "was similar to that which would be given in school and was related to Plaintiffs' course of study."  (Doc. #226, p. 7 (quoting Kaplan, 504 Fed. App'x at 835).)  "Plaintiffs' time at Collier served as the COA-required[9] clinical portion of their master's degree program.  Plaintiffs received academic credit and grades for their clinical time, which allowed them to graduate and sit for the nurse anesthesia certification exam."  (Id. p. 8 (docket citations omitted).)  Moreover, any "ministerial activities" Plaintiffs were routinely required to perform (stocking anesthesia carts, filling out patient forms, etc.) were at least "related" to their studies.  (Id.)  The Court now reexamines the evidentiary record and these legal conclusions through a Schumann lens.[10]

---

[9] "COA" is short for "Council on Accreditation of Nurse Anesthesia Educational Programs," which is the organization that accredits nurse anesthesia programs.

[10] As before, the Court does not find Plaintiffs' allegations of verbal and physical abuse by Collier anesthesiologists and CRNAs relevant to whether Plaintiffs were employees.  Swearing, name-calling, and inappropriate physical contact are not routine or accepted characteristics of a workplace, let alone "any interaction between human beings."  (Doc. #173-4, p. 20.)

Contrary to Plaintiffs' contentions, much of the evidence tends to show that the 16-month clinical phase of Plaintiffs' SRNA education consisted of valuable hands-on training and was indeed "similar to that which would be given in an educational environment." Schumann, 803 F.3d at 1212 (quoting Glatt, 791 F.3d at 384). Before shifts, the students were "really encouraged to read up . . . [and] be ready with answering questions about what specific anesthesia [they] would use for th[e] particular case." (Doc. #179-1, p. 24 (90).) SRNAs were quizzed by CRNAs and anesthesiologists while they performed the different anesthesia administration steps. (Id.; Docs. ## 179-34, p. 8 (152); 179-53, p. 24 (190-91).) There were academic lectures at the clinic. (Doc. #179-2, p. 4 (106-07).) At the end of every clinical shift, the students had to fill out an evaluation, and CRNAs or anesthesiologists were required to grade their performance. (Doc. #175-1, ¶¶ 10, 19.) Each week, the students had to turn in answers to several "clinical questions," which were designed to "help with passing the boards." (Doc. #179-2, p. 3 (102-03).) The students had to prepare graded short-care plans for every case on which they worked and numerous long-care plans, which were significantly more time-intensive, for difficult or unusual cases they had experienced. (Docs. ## 177-3, p. 21 (83-84); 178-1, pp. 31-32 (124-27).) In short, the integration of academic and practical components made Plaintiffs' clinical and classroom experiences largely one and the same. See Hollins, 144 F. Supp. 3d at 999.

Collier also required SRNAs to handle, on a daily basis, several tasks auxiliary to the administration of anesthesia - many of which are typically performed by an anesthesia technician or a registered nurse.  These included unboxing supplies and restocking anesthesia carts, preparing rooms and sterilizing equipment, drawing up medications, and filling out patients' pre-operative forms.  But performance of these "tech" tasks did not alone turn Plaintiffs' clinical experience into a work environment. Schumann, 803 F.3d at 1203-04.  Several plaintiffs, now licensed CRNAs, acknowledged they perform most or all of these tasks in practice.  (Docs. ## 179-34, p. 27 (227); 179-52, p. 10, 14-15 (38-39, 56-57); 251-1, pp. 23-24 (89-94).)  Even when an anesthesia tech is available, a CRNA typically must check the tech's work.  (Docs. ## 178-1, p. 29 (116); 178-2, p. 11 (181); 179-14, p. 10 (40); 179-52, p. 11 (43).)  Plaintiffs clearly benefitted from regularly practicing tasks that CRNAs routinely perform (or double-check) in practice.[11]  Thus, the fact that Collier SRNAs handled these duties daily does not, on its own, support Plaintiffs' claim that they were "employees" or show that Defendants took unfair advantage of them.[12]

Plaintiffs also contend that their clinical experience was not akin to a classroom setting because they were often left alone

---

[11] Certain plaintiffs acknowledged that mastering these skills was a valuable aspect of the clinical program.  (Docs. ## 178-1, p. 29 (113-14); 178-2, p. 13 (191-92); 179-75, p. 20 (77).)

[12] The Court separately addresses Plaintiffs' claim that they displaced paid workers when they performed these tasks below.

with patients.  As this Court previously noted, however, "some autonomous activity is inevitable, but that does not mean SRNAs were not closely supervised."[13]  (Doc. #226, p. 11.)  It is undisputed that Plaintiffs were never outside the presence of a licensed anesthesia provider for the induction and emergence phases of anesthesia administration, only during the maintenance phase, at which time the surgeon was also usually in the room.[14] (Docs. ## 177-3, p. 10 (39); 179-75, pp. 22-23 (85-86).)  And even when they were not directly supervised, the students had radios with which they could reach CRNAs and anesthesiologists at all times.  (Docs. ## 173-4, p. 11; 179-14, p. 23 (89).)

More importantly, being able to perform certain tasks independently is a valuable, perhaps crucial, component of a SRNA's education.[15]  "The day after a student graduates and passes Boards . . ., that student will likely be alone in a room with a patient and solely responsible for providing the anesthesia to the

---

[13] The allegations of "questionable" and "dangerous" supervision in the Declarations of Dr. Michael Barile (Doc. #251-2) and CRNA Sherry Kutz (Doc. #256-2) are too vague to create a genuine issue of material fact regarding the adequacy of Collier's supervision. See Benjamin, 2015 WL 616 4891, at *3.

[14] It is significant that, in practice, CRNAs generally handle the maintenance phase without an anesthesiologist present.  (Docs. ## 173-10, p. 15; 179-75, p. 23 (86).)

[15] For Plaintiff Gibson, this "sink or swim" environment prepared her well to practice as a CRNA.  (Doc. #179-14, p. 19 (75-76).) Plaintiff Nachtrab acknowledged that being alone with a patient as a SRNA removed "the fear of it being the first time when [she] started work as a CRNA."  (Doc. #179-34, p. 21 (204).)

patient."[16]   (Doc. #175-1, ¶ 28; see also Doc. #179-33 pp. 11, 12

(32, 36-37).)   In fact, one of the curriculum requirements set

forth in the COA's Standards for Accreditation is that students be

provided "opportunities for experiences in the perioperative

process that are unrestricted[] and promote their development as

competent safe nurse anesthetists."   (Doc. #45-6, p. 15.)

Accordingly, the fact that Collier SRNAs often worked without line-

of-sight supervision does not, on its own, undercut a finding that

Plaintiffs were students.   See Mark, 2016 WL 1271064, at *9-10

(the fact that an intern "was expected to work independently" at

his journalism internship did not detract from the "vocational

training and mentorship" he received while interning, which was

similar to what is provided in a journalism school environment).

    The record does, however, contain other evidence from which

a jury could conclude that the clinical education Plaintiffs

received was at times deficient, as would support their FLSA

claims.   See Solis v. Laurelbrook Sanitarium & Sch., Inc., 642

F.3d 518, 528 (6th Cir. 2011).   Plaintiffs attended Wolford to

train to become well-rounded nurse anesthetists, but it seems not

all of them graduated feeling they succeeded in that endeavor.

Plaintiff Rosado's pediatrics rotation was involuntarily reduced

from three weeks to four days, and, as a result, he has

purposefully avoided working on pediatrics cases as a CRNA.   (Doc.

#179-53, pp. 11-12 (141-44).)   Plaintiff Abraham felt "ill-

---

[16] Plaintiff Vinas testified that she in fact had a "full schedule"
on her first day as a CRNA.   (Doc. #179-75, p. 12 (44-45).)

prepared" to administer "regional anesthesia epidurals" when he graduated. (Doc. #178-1, p. 26 (103-04).) Plaintiff Schumann believes that, as a result of being kept "too busy doing other work rather than concentrating on [his] educational needs," he did not receive enough exposure to certain areas of anesthesia. (Doc. #179-53, p. 17 (162).)

Dissatisfaction with aspects of an internship does not turn students into employees. But here there is evidence from which a reasonable jury could infer that the specific educational deficiencies alleged resulted from Defendants having scheduled SRNAs to best serve Collier's financial interests. Deposition testimony and various exhibits indicate, for example, that upperclassmen SRNAs may have been removed from specialty rotations and assigned to more routine cases to allow Collier to use the financially-beneficial 1:2 CRNA:SRNA supervisory ratio,[17] (Docs. ## 173-12, pp. 109-10; 173-13, pp. 100-03; 179-14, p. 16 (61-62)); to monitor a more junior SRNA, (Doc. #177-4, p. 23 (199)); when coverage in certain areas was "short," (Doc. #178-2, p. 21 (221)); when Collier expanded to new facilities, (Doc. #173-12, pp. 96, 99, 112); and when it was time for CRNAs "to go home." (Docs. ## 173-21, p. 78; 178-2, pp. 15, 16 (199, 202).) If true, this would suggest the type of "abuse" to which Schumann alludes. See Guy, 2016 WL 4479537, at *5 (the fact that "Aveda subordinated the

---

[17] While, as discussed below, it is not appropriate to view use of this ratio as evidence of *displacement*, the Court does not read Schumann as precluding consideration of whether the manner in which Defendants did so short-changed Plaintiffs' clinical education.

interests of its students' education to its own interest in providing services to paying customers" supported a finding that cosmetology school students were clinical salon "employees").

Multiple Plaintiffs also described the negative impact excessive clinical hours had on their academic performance. (Doc. #179-33, p. 33 (122) ("I feel my grades and my board preparation suffered because of it. We should be limited to 40 hours per week."); #179-53, p. 19 (172) ("[W]e have to take away from our study time . . . because we have to be there so many hours[,] because we are used so Collier Anesthesia can function.").) SRNAs were sometimes scheduled to work a clinical shift after a "call" day, meaning they were not always given the proper 10-hour rest period between shifts. (Docs. ## 173-9, p. 21; 173-26; see also Docs. ## 45-6, p. 40; 173-19, p. 7.) When students complained about failing exams because they were scheduled for too many clinical hours and did not "have time to study," their "scores were adjusted to help them pass." (Doc. #251-1, p. 14 (54).)

Wolford students' exam issues continued with their Boards, which they generally took within one month of graduating. Although nearly all Wolford SRNAs who take the National Certification Exam (NCE) end up passing, that statistic does not tell the whole story.[18] According to Wolford's website, the

---

[18] Because the Court finds it appropriate "to consider evidence about [the] internship program as a whole," Glatt, 811 F.3d at 537, it is irrelevant that only one plaintiff who took the NCE (not all did) did not pass on the first attempt.

school's two 2011 classes had a 73% first-time passage rate,[19] whereas, nationwide, 89.1% of SRNAs passed the NCE on the first try in 2011.[20]   (Doc. #175-13, p. 33.)   On the other hand, while 100% of Wolford's repeat test-takers passed the NCE in 2011, on a national scale, only 57.2% did.[21]   (Doc. #175-12 p. 5.)   That Wolford's first-time test takers performed *worse* than the national average, and repeat test takers markedly *better*, is a fact from which a jury could reasonably infer that Defendants' clinical requirements (which were allegedly supposed to be eight hours *less* per week in the final semester, but were not in practice) negatively affected students' ability to prepare for the NCE.[22]

In sum, because there is evidence from which a reasonable jury could conclude that much of the program was "a *bona fide* internship that primarily benefit[ted] the [SRNAs]," Schumann, 803 F.3d at 1214, but also that, at least at times, Defendants placed their business interests first, thereby short-

---

[19] Wolford College, Enrollment/Graduation (last accessed October 24, 2016), wolford.edu/about-us/enrollment-graduation/.

[20] 61.9% of Wolford's 2010(B) class passed the NCE on the first try, compared to 89% nationwide in 2010.   On the other hand, in 2012, 89.8% of Wolford's SRNAs passed the NCE on the first attempt, compared with 88.5% nationally.   The average first-time passage rate for Wolford's 2010-2012 classes was approximately 77.63%, and, nationwide, it was 88.83%.

[21] The Court does not have national data for repeat test-takers for other years.

[22] After failing the NCE, Plaintiff Rosado – who had already graduated Wolford - was able to devote all of his time to studying, and he passed on the second try.   (Doc. #179-52, p. 8 (29-30).)

changing aspects of the SRNAs' education, neither side can successfully claim this factor at the summary judgment stage.

### 3)   Glatt Factor Three: Coursework Integrated into the Internship and the Receipt of Academic Credit

The third Glatt factor examines the extent to which the internship incorporates formal coursework and is one for which the intern receives academic credit.  In a case in which the internship forms the majority (or all) of students' academic experience for one or more semesters, this factor will often overlap with the second.  That is the case here.  As discussed, Plaintiffs were graded on their clinical performance, they were orally quizzed while engaging in anesthesia administration, and they were required to submit answers to written questions about cases and to prepare short-care and long-care plans.  Upon completion of each of the first three clinical semesters, Wolford SRNAs received five credits, and for the fourth (and final) clinical semester, they received four credits.

There is, however, a material dispute that prevents summary judgment on this factor.  Leslie Hussey, one of the individuals responsible for writing Wolford's SRNA program curriculum, testified that the credits-to-hours ratio contemplated was "8 clinical hours to 1 credit hour, which would mean they would have 40 hours of clinical experience per week" during the first three clinical semesters and 32 hours in the final semester.  (Doc. #251-1, p. 13 (51-52).)  As discussed further below, Plaintiffs contend they were required to work significantly more than forty

clinical hours each week, and that there was no reduction in the hours during the final semester.[23]   Thus, there is a dispute regarding the connection, if any, between the number of academic credits Wolford SRNAs received during their clinical semesters and the number of clinical hours worked.   To the extent a jury deems Ms. Hussey's and Plaintiffs' testimony credible, this could favor a finding that, at least at times, Plaintiffs were employees.

### 4)   _Glatt_ Factor Four: Interning When School Is "Out of Session"

The fourth _Glatt_ factor considers the extent to which the internship schedule and responsibilities correspond with the students' academic calendar.   "In a case like this one, where the clinical training and the academic commitment are one and the same, this consideration must account for whether a legitimate reason exists for clinical training to occur on days when school is out of session."   _Schumann_, 803 F.3d at 1213.

The first task, then, is to determine when Wolford College is "out of session."   According to Defendants, school is _never_ out of session during the four clinical semesters of the SRNA master's program.   Rather, for those sixteen months, "the students' clinical curriculum **is** the[] [students'] 'school,' and their clinical time [i]s 'full time,' including 'holidays and College breaks.'"   (Doc. #258, p. 15.)   The Court rejects that

---

[23] Program Director Lauren Corder confirmed that Wolford SRNAs are expected to work the same number of clinical hours during their final semester as during the other semesters, despite receiving less academic credit that semester.   (Doc. #173-20, pp. 57-58.)

proposition.   Generally speaking, school is "in session" Monday through Friday and "out of session" on Saturday and Sunday, on major holidays, and for a period of time after each semester.[24]

There is no question that Plaintiffs worked when Wolford was out of session.   Defendants scheduled SRNAs to work regular or call shifts 365 days per year, including on weekends and holidays, and during Wolford's one-week "administrative time" period following each semester.   (Docs. ## 173-9, pp. 71, 75; 173-12, pp. 61-62; 173-16, p. 12; 173-20, pp. 109-10; 173-24, pp. 13-19; 177-3, p. 24 (96).)   Sometimes, students were even scheduled for clinical training after they had already graduated, apparently as punishment for missing a shift, no matter the reason.[25]   (Docs. ## 179-53, p. 6 (120-21); 256-3, ¶ 9.)   The question under Schumann is whether there was a *legitimate reason* for this scheduling.

The Court does not doubt that "[a]nesthetics are delivered 24 hours a day, seven days a week."   (Doc. #179-67, p. 52.) Even

---

[24] Wolford's academic calendar observes five major holidays and a one-week period following the end of each semester. (Doc. #179-68, p. 15.)   For Wolford students in the didactic phase of their education (the first three semesters, spanning twelve months), these one-week periods are vacation time. (Docs. ## 179-67, p. 22; 179-68, p. 13.)   For students in the clinical phase, however, this is "administrative time" during which "Clinical Education continues." (Doc. #179-67, p. 23.)   Clinical students were given a one-week vacation and five "PTO" days for the entirety of their last four semesters (sixteen months). (Doc. #179-68, p. 13.)

[25] Plaintiff Penton was required to make up the one clinical shift he missed when his father died unexpectedly with two shifts at the end of the year, after he had already finished his exams and met his case requirements. (Doc. #256-3, ¶ 9.)   Plaintiff Rosado claims he was punished for a misunderstanding regarding his call availability with an entire extra week of clinical hours after he had already graduated. (Doc. #179-53, p. 6 (120-21).)

so, Defendant's argument that a SRNA's clinical "training mandates a full time, 24/7/365 (holidays included) schedule because that is what [the students] face upon graduation" rings hollow. (Doc. #258, p. 15.) Collier CRNAs actually appear to work very regular schedules, generally limited to forty or fewer hours per week, typically between Monday and Friday.[26] (Doc. #173-12, pp. 20-22, 48; see also Doc. #173-8, pp. 20-22.) In fact, a Collier CRNA is a "full time employee" if he or she works just thirty hours per week. (Doc. #173-7, p. 17.) More to the point, the Court does not see how the fact that anesthesia is administered on weekends and holidays is something for which SRNAs (who are already, by law, registered nurses) need extensive training - especially since they already obtain valuable "call" exposure to emergency cases when they work weekday afternoon and nighttime shifts.[27] (Docs. ## 173-11, p. 18; 173-18, pp. 70-71.) Nor can the Court identify any legitimate reason for Defendants' disciplinary policy of requiring SRNAs to work "make-up" shifts after they have graduated.

---

[26] The Court presumes Collier CRNAs are given more than one week of vacation and five PTO days in a 16-month period.

[27] To be accredited, Wolford was required to "provide[] opportunities for students to obtain clinical experiences outside the regular clinical schedule by a call experience or other mechanism," (Doc. #45-6, p. 15 (emphasis added)), which it did by having students work weekday shifts other than the standard 7:00 a.m. to 3:00 p.m. (See Doc. #179-68, p. 1 ("Call time is . . . any time spent in the OR after 3 PM.").) Dr. Michael Nolan in fact testified that the 12:00 p.m. to 8:00 p.m. and 3:00 p.m. to 11:00 p.m. shifts were "designed to give the students an opportunity to see what it was like to take call later on in the evening." (Doc. #173-18, pp. 70-71.)

There is, however, another legitimate reason SRNAs may have been routinely scheduled to work on out-of-session days: the need to ensure all students obtained the number and types of anesthesia cases required to both take the NCE and become well-rounded CRNAs. It may have been difficult, if not impossible, to schedule all four groups of Wolford SRNAs (approximately two-hundred) that were simultaneously in the clinical phase of their education only on days school was "in session."[28]  Collier, like most anesthesia practices, has little control over when surgical procedures are scheduled; that is dictated by the surgeons and can change suddenly.  (Docs. ## 173-18, pp. 26-27; 179-14, p. 25 (97).)  At times, SRNAs must be removed from cases for a variety of reasons outside of Collier's control, such as when a particular surgeon or patient does not want them there.   (Doc. #173-4, p. 43.)  Moreover, assigning multiple SRNAs to one case decreases the level of active participation for each student and is inefficient, since only the most senior student can "record" the case for graduation purposes.[29]  (Doc. #179-75, p. 30 (117).)  Because there is a genuine dispute as to whether Defendants had a legitimate reason to schedule SRNAs when Wolford was "out of session," the fourth Glatt factor does not favor summary judgment for either side.

---

[28] Wolford College, Enrollment/Graduation (last accessed October 24, 2016), wolford.edu/about-us/enrollment-graduation/.

[29] Whether too many SRNAs were assigned to one case was, in fact, one of Plaintiff Vinas's main concerns about attending Wolford/interning for Collier.  (Doc. #179-75, p. 15 (54).)

**5)** **_Glatt_ Factor Five - The Length of the Internship**

In discussing the fifth _Glatt_ factor - the extent to which the internship's duration is limited to the period in which the intern is provided "beneficial learning" - the Eleventh Circuit found Wolford's four-semester (28-month) internship duration and the average number of cases completed during that time (well above the COA-required 550) _inexcessive_ as a matter of law. _Schumann_, 803 F.3d at 1214. The Circuit Court also left clear, however, that "excessiveness" is both a macro and micro inquiry. In addition to considering the total duration of the internship, "the court should also evaluate the extent to which the nature of the training requires the daily schedule that the intern must endure." Id. Thus, in the context of this case:

> if the reason that the SRNAs completed well in excess of 550 cases during their four clinical semesters <u>was because they were made to work grossly excessive hours</u>, that would be an indication that the employer may have unfairly taken advantage of or otherwise abused the SRNAs and that they should be regarded as "employees" under the FLSA.

Id. (emphasis added).

_Schumann_ does not say what "regular" or "grossly excessive" hours are for a SRNA generally, nor for Plaintiffs specifically. Defendants contend there is no genuine issue that this factor favors a finding that Plaintiffs were students, not employees, since the _total_ number of clinical and anesthesia hours Plaintiffs recorded as having worked during their internships was on par with national SRNA averages. This argument ignores _Schumann_'s

admonishment to consider the interns' *daily* schedules when evaluating excessiveness. Comparing Plaintiffs' total hours to national averages is not especially helpful in making this determination, since other SRNA programs vary in length from 24 to 36 months. (Docs. ## 169-2, p. 3; 179-1, p. 7 (24)); see Glatt, 811 F.3d at 539 ("The question of an intern's employment status is a highly context-specific inquiry.").

This Court finds it appropriate to interpret Schumann's "grossly excessive" language by reference to the definition of "call time" in the COA's Accreditation Standards and Wolford's Student Handbook. "Call" is "[a] planned clinical experience outside the normal operating hours of the clinical facility . . . and on weekends." (Docs. ## 45-6, p. 35; 179-67, p. 52.) Collier facilities' "normal operating hours" are 7:00 a.m. to 3:00 p.m. (See Docs. ## 173-8, pp. 21-22; 173-12, pp. 21, 23, 25; 173-18, pp. 70-71.) A "normal workweek" for a full-time Collier CRNA is between thirty and forty hours.[30] (Doc. # 173-11, p. 33.) In the context of this case, then, eight-hour shifts and forty-hour workweeks constitute "regular" SRNA hours, and, naturally, anything more than that is "excessive." Accordingly, the Court holds that Collier SRNAs worked "grossly excessive" hours if, more weeks than not, they either worked five or more shifts averaging 10 or more hours each, or they worked 50 or more total hours.

---

[30] The typical Collier CRNA shift is 7:00 a.m. to 3:00 p.m. Those CRNAs who work longer shifts also start at 7 a.m. but work fewer days, for a total of forty or fewer hours per week. (Docs. ## 173-12, pp. 20-22; 173-20, p. 15.)

Stated in Schumann terms, regularly working clinical shifts of ten or more hours or logging more than fifty clinical hours per week goes "well beyond the bounds of what could fairly be expected to be a part of [Plaintiffs' SRNA] internship."[31] Schumann, 803 F.3d at 1215.

Collier SRNAs were typically scheduled for eight-hour shifts, mostly between 7:00 a.m. and 3:00 p.m., four to six days per week, for an average total of between thirty-two and forty-eight scheduled hours per week. (Docs. ## 173-9, p. 75; 173-12, pp. 55-56; 173-24, pp. 13-19; 177-4, p. 4 (123); 251-1, p. 12 (46).) Plaintiffs claim, however, that - in addition to their other time-consuming academic commitments[32] - they were actually working more than eight hours per day and averaging fifty or more hours per

---

[31] The "reasonable time commitment" definitions in the COA's Standards for Accreditation and in Wolford's Student Handbook support this conclusion. According to the COA, "[a] reasonable number of hours to promote effective student learning should not exceed 70 hours per week averaged over four weeks. This time commitment includes time spent in class and in clinical, [and] preparing for class and clinical . . . ." (Doc. #45-6, p. 40 (emphases added).) Similarly, Wolford's Student Handbook advises students to "expect to spend approximately 60-65 hours per week directly related to Wolford College, i.e.: study, classroom, clinical time," and specifies further that "[c]linical time with call coverage will not exceed 50 hours per week." (Doc. 179-67, pp. 48, 50 (emphases added).) Moreover, Dr. John Nolan, the Dean of Wolford, testified that 40 clinical hours was the weekly "maximum" for SRNAs. (Doc. #173-15, p. 68.)

[32] During their four clinical semesters, Wolford SRNAs still took classes and studied for exams, were required to attend "journal clubs" and "mortality & morbidity seminars," and had to prepare numerous daily short-care plans and several intensive long-care plans for their cases. (Docs. ## 173-20, pp. 33, 36-37; 178-1, pp. 31-32 (124-27); 179-68, p. 6; 179-75, p. 26 (99-100).)

week[33] – mostly because of all the tasks they had to perform before the CRNAS arrived and after they went home at 3:00 p.m.

Defendants argue that Plaintiffs' testimony should be disregarded, since the clinical time entries Wolford SRNAs were required to make – first through a program called "Medtrax," and later through one called "Empower" – show Plaintiffs generally worked shifts of eight or fewer hours and averaged about thirty-six hours per week.  (Doc. #259, p. 17.)  Defendants argue further that Plaintiffs swore to the accuracy of their time records before taking the NCE, so they should not be permitted to dispute those records now.  (Id. p. 16.)   However, not only do other portions of the evidentiary record tend to corroborate Plaintiffs' testimony that they worked more than their scheduled hours,[34] there

---

[33] (Doc. #177-3, p. 7 (28) ("[W]e were there from 5:30, 5:45 typically at the latest at the main OR.  And I mean we went past 3:00 o'clock, so."); #179-14 ("[H]aving the requirement to arrive sometimes two hours early[,] so that was two hours in addition each day, which is 10 extra hours just coming two hours early . . . ."); #179-53, p. 20 (176) ("You get there at 6:00, you leave at 4:00 every day – 4:00 or even later, you're doing at least ten hours a day, five days a week."); #179-74, p. 19 (210-11) ("I worked 5:30 in the morning until 3:30 or 4:00, that's ten hours a day, times five, that's fifty hours, and then one night a week I was on call and every other weekend I was on call . . . .").)

[34] Wolford's Student Handbook states that "[s]tudents are expected to arrive at least 1/2 hour prior to the beginning of the shift to set up and be ready to start the case."  (Doc. 179-67, p. 50.)  SRNAs were specifically told to arrive at Naples Day Surgery North at 6:00 a.m. and at Naples Community Hospital South as early as 5:00 a.m.  (Doc. #173-9, pp. 73, 82.)  Program Director Corder stated that students would arrive for shifts starting at 6:00 a.m., (Doc. #173-21, p. 7), and several Collier anesthesiologists testified that, when they arrived at the hospital in the morning (usually between 6:30 a.m. and 6:45 a.m.), SRNAs were already there.  (Docs. ## 173-8, p. 51; 173-10, p. 38; 173-18, p. 25.)

is also a genuine issue as to the reliability of those time entries.

According to Plaintiffs, "Medtrax [was] not used for timekeeping. It[] [was] used for caseload." (Doc. #179-75, p. 33 (126).) "The whole purpose of Medtrax was to enter your cases and then make sure that you got them, the types of cases that you needed." (Id. p. 32 (122); see also Docs. ## 179-14, p. 24 (94-95); 179-34, p. 25 (220, 222); 179-52, p. 7 (26-28).) There is testimony that students were not shown how to properly record time using the programs, (Doc. #177-3, p. 8 (30)), and, in fact, there are documented instances in which Plaintiffs made clerical mistakes when entering their hours. (Docs. ## 178-1, p. 34 (136); 179-2, p. 5 (112-13); 179-52, p. 24 (93-94).) Several Plaintiffs also testified that days or weeks would sometimes pass before they could record their clinical time, which may have affected their accuracy.[35] (Docs. ## 177-3, p. 8 (30-31); 179-52, p. 7 (28); 179-75, p. 7 (24-25).) Whether Plaintiffs' testimony is credible is an issue for the jury to decide. Summary judgment of the fifth Glatt factor is not warranted.

**6)   Glatt Factor Six – Whether Interns Displace or Merely Complement Paid Employees**

In their original summary judgment motion, Plaintiffs' main displacement argument was that Collier regularly called off CRNAs and used students in their place at a 1:2 CRNA:SRNA supervisory

---

[35] Plaintiff Rosado testified that, rather than overstate his hours if he could not recall how much he had worked, he erred on the side of caution and underestimated them. (Doc. # 179-53, p. 179.)

ratio, so as to benefit financially from the "Revised Teaching Rule."   This Rule authorizes anesthesia practices that use one CRNA to supervise two rooms, each with a SRNA, to enter a "QZ" billing code for the procedures.   This generates the same Medicare reimbursement as if a different (paid) CRNA had supervised each room, thereby resulting in greater profit for the practice.

Although the Court granted summary judgment for Defendants, the Court identified genuine issues of material fact bearing on the displacement factor – namely, Ms. Rose's testimony that SRNAs were used instead of paid CRNAs to keep Collier's payroll costs down.   In remanding the case, however, the Eleventh Circuit stated that when assessing displacement, "it would not be appropriate to consider Collier's use of the Rule as evidence that Collier unfairly took advantage of the SRNAs when it scheduled two SRNAs to be supervised by a single CRNA."[36]   <u>Schumann</u>, 803 F.3d at 1214. The Circuit Court observed further, though, that evidence tending to show "CRNA hours may have been displaced by SRNA hours for

---

[36] Defendants admittedly had "no formal prerequisite for students being in a two-to-one situation with a CRNA." (Doc. 173-20, p. 109; <u>see also</u> Doc. #173-12, p. 31).   This ostensibly violates the COA's requirement that the clinical supervision ratio reflect "[t]he student's knowledge and ability; the physical status of the patient; the complexity of the anesthetic and/or surgical procedure; and the experience of the instructor." (Doc. #45-6, p. 22); <u>see also</u> Docs. ## 169-1, p. 152; 256-2.)   As this Court reads the Eleventh Circuit's opinion, however, this fact may not be considered as evidence of displacement.

reasons other than the Revised Teaching Rule" should be considered on its "own merit."[37]  Id.

Here, there is evidence from which a jury could fairly infer that SRNA hours displaced CRNA hours at times other than when Collier was using one CRNA to supervise two SRNAs.  Whereas most Collier CRNAs left by 3:00 p.m., SRNAs were scheduled to work 12:00 p.m. to 8:00 p.m. and 3:00 p.m. to 11:00 p.m. shifts.  Some Collier facilities did not staff any CRNAs and instead exclusively used SRNAs to assist anesthesiologists.  (Docs. ## 173-4, p. 52; 173-11, p. 16; 173-12, pp. 42-43; 173-13, pp. 4-5, 25; 179-33, p. 30 (108-09); 204-6, p. 50).)  Even at facilities where CRNAs worked, it was the SRNAs who were required to arrive well before surgery began to ensure the operating room and paperwork were ready.  (Doc. #177-4, p. 33 (236-37).)  SRNAs were often required to stay after the cases on which they were assisting ended (and the CRNAs left) to restock materials, set up rooms, and fill out paperwork for other cases with which they were not involved.[38]  (Docs. ## 173-9, pp. 60-62; 177-4, pp. 12, 23 (155, 196); #179-14, p. 23 (91-92).)  Had a SRNA not been required to handle these tasks, it is reasonable to infer that a busy anesthesiologist would not have gotten everything ready; rather, a Collier CRNA would have been

---

[37] The declarations submitted by Ms. Rose (Doc. #251-3) and CRNA Sherry Kutz (Doc. #256-2) to support Plaintiffs' displacement argument are not helpful, as neither indicates whether CRNA hours were displaced for reasons *other than* use of the 1:2 ratio.

[38] Dr. Janyja confirmed that SRNAs "do the lion's share of the completion of [inpatients'] pre-op forms." (Doc. #173-11, p. 4.)

paid hourly (and perhaps overtime) to do so,[39] or an anesthesia tech would have been hired.[40]   Indeed, despite Defendants' contention that, without SRNAs, cases could have been staffed with an anesthesiologist, rather than with a CRNA, there is evidence that Collier anesthesiologists did not typically run cases alone, without the involvement of SRNAs or CRNAs.  (Docs. ## 173-8, p. 66; 173-9, p. 39; 204-6, pp. 93-94).)

Another fact from which displacement could be inferred is the "black out time during the AANA [American Association of Nurse Anesthetists] national convention . . . where no vacation or time away from clinical [was] allowed" for Wolford SRNAs.  (Doc. #179-68, p. 13.)   Only a limited number of SRNAs were allowed to attend the convention, even though more wanted to go, since they were

---

[39] A Collier "CRNA's compensation is directly tied to the number of hours the CRNA works."  (Doc. #173-7, p. 19; see also Doc. #173-18, p. 46.)   "Overtime is paid over 40 hours" and on "[w]eekends and holidays."  (Doc. #173-7, p. 37.)

[40] It appears that only one Collier clinical site, Naples Community Hospital, had an anesthesia technician.   As discussed above, practicing the tasks techs are employed to perform is a crucial component of a SRNA's education.   But regardless of the *value* Plaintiffs gained from performing these tasks regularly, a jury could reasonably infer that Plaintiffs were required to do so because Collier wanted to avoid hiring (and paying) techs.   This, in turn, would weigh in favor of a finding that Plaintiffs were, at least at times, employees.   The Court observes further that even if the decision of whether to employ anesthesia techs is technically made by the medical facilities, Dr. Janyja, a Collier shareholder and anesthesiologist, is the Chairman of the Anesthesia Department for the NCH Healthcare System, which includes several SRNA clinical sites.  (Doc. #173-10, pp. 20-21.) Moreover, at least some Collier partners have a financial stake in certain NCH facilities, for which they receive monetary distributions.  (Doc. #173-16, pp. 56-57.)

"required to be in Naples to run rooms."[41]  (Doc. #173-21, p. 46;
see also Doc. #173-20, p. 130.)  Losing even a handful of students
that week apparently caused Defendants scheduling headaches.  For
example, it was suggested that students attending the conference
not be scheduled on rotations that "depend[ed] on" SRNAs prior to
leaving.  (Doc. #173-21, p. 46.)  Ultimately, it is up to the jury
to decide whether the disputed material facts of this case support
a finding that Plaintiffs displaced paid staff.

**D.   Wolford's "For Profit" Status and Ownership by Collier**

        Plaintiffs argue that Wolford's "for profit" status and 100%
ownership by Collier anesthesiologists support a finding that
Plaintiffs were employees.  Neither Glatt nor Schumann address the
relevancy of these factors, if any, but a few pre-Glatt courts
discussed the for-profit issue in passing.  See Isaacson v. Penn
Cmty. Servs., Inc., 450 F.2d 1306, 1309-10 (4th Cir. 1971) (finding
defendant's nonprofit status relevant to the Portland Terminal
analysis, since "any benefit to [defendant] was [a] benefit to the
public at large - a benefit of a different nature than that of a
for-profit enterprise"); Marshall v. Baptist Hosp., Inc., 473 F.
Supp. 465, 469 n.6 (M.D. Tenn. 1979), rev'd on other grounds, 668
F.2d 234 (6th Cir. 1981) ("[A] For-profit corporation . . . is

---

[41] (Doc. #173-21, p. 44 ("There's [sic] 8 students already approved
to go from Naples and about 10 more on a waiting list. . . . So
for every Naples student we don't send to Tampa and Davenport, I
imagine that would be 1 *less* student that we could send from the
Tampa/Davenport hub to AANA."); see also id. pp. 45-48.)

more likely to be an employer within the meaning of the FLSA than a non-profit institution in like circumstances.").

The Court agrees that Wolford's for-profit status and 100% ownership by Collier are appropriate additional factors for the jury to consider when evaluating Plaintiffs' employment status under the FLSA.  Whereas a non-profit's "corporate purposes are the public good in the community in which it operates," Isaacson, 450 F.2d at 1309, the goal of a for-profit company is, as Ms. Waterhouse acknowledged, "to make a profit for its shareholders." (Doc. #173-5, pp. 10-11.)  That may especially be so where, as here, those shareholders have acquired the corporation's pre-existing debt and further invested in its growth.[42]  (Docs. ## 173-3, pp. 89-90; 173-8, pp. 24-25.)  The focus on making a profit provides, in turn, a greater incentive to elevate shareholders' financial interests over students' educational experience, particularly where the entity running the internship program also owns (and receives distributions from) the for-profit institution supplying the student interns. If Plaintiffs can draw a connection between the educational deficiencies they allege made them "employees" and either Collier's ownership of Wolford or Wolford's

---

[42] Wolford began as a non-profit entity.  (Doc. #173-3, p. 78.) It has been profitable since its incorporation.  (Doc. #173-5, pp. 10-11.)

for-profit status[43] (or both), they will be permitted to so argue at trial.

**E.    The Relevant Statute of Limitations and Liquidated Damages**

The Wolford Defendants alternatively argue that summary judgment is warranted in their favor on Plaintiffs' claim for liquidated damages, and on any claims falling outside of the FLSA's two-year statute of limitations.    In support of the latter argument they cite Kaplan v. Code Blue Billing, 504 Fed. App'x 831 (11th Cir. 2013), the unpublished opinion on which this Court largely relied in granting Defendants' original summary judgment motions.    Kaplan involved FLSA claims for unpaid wages and overtime brought by students enrolled in a Medical Billing and Coding Specialist educational program for which they were required to complete a billing externship.    Before addressing the merits of the FLSA claims, the Eleventh Circuit dismissed one of the plaintiff's claims under the FLSA's two-year statute of limitations.    While noting that FLSA Section 225(a) extends the statute of limitations to three years for "willful violations," the Court concluded that the plaintiff could not make the requisite "willfulness" showing.    Because the defendant knew the plaintiff

---

[43] For example, several plaintiffs complained about not obtaining sufficient experience on certain types of anesthesia cases.    There is evidence that Wolford's annual SRNA class size (approximately 100 students) was about **ten times** higher than in other SRNA programs.    (Doc. #169-1, p. 53.)    If Wolford's class size increased substantially after the school incorporated, a jury could fairly infer that the goal of generating a profit from tuition was elevated over the importance of keeping classes reasonably sized to ensure all SRNAs received a thorough, well-rounded clinical education.

"would receive academic credit in exchange for his work and that completion of such an externship was required for graduation," the plaintiff could not show by "a preponderance of the evidence that [the defendant] either knew that its conduct was prohibited by the statute or showed reckless disregard about whether it was."  Id. at 833 (citing Alvarez Perez v. Sanford–Orlando Kennel Club, Inc., 515 F.3d 1150, 1162-63 (11th Cir. 2008)).

Here, too, Defendants knew Plaintiffs received credit for their clinical internship and that completing the internship was required to graduate and take the NCE.  Given that Schumann does not mention Kaplan, however, Kaplan's resolution of the statute of limitations issue is not persuasive here.[44]  Further, the record in this case contains facts from which a reasonable jury could conclude Defendants either knowingly violated the FLSA or showed reckless disregard for its provisions.  Collier's "sales pitch" to hospitals cited SRNAs' involvement in the "[a]nesthesia care team environment" as one of the business advantages Collier offers. (Doc. #173-31.)  Both Dr. Cook and Dr. John Nolan viewed Wolford SRNAs (already registered nurses) as more akin to medical residents than to students.  (Docs. ## 173-4, p. 101; 173-16, pp. 7-8, 84.) Residents, as Dr. Cook and Dr. Nolan knew from experience, are

---

[44] Defendants also argue that, "where plaintiffs seek to reverse or circumvent established case law and create new law of first impression, there is no basis for a claim of a willful violation." (Doc. #174, p. 50 (citation omitted).)  The flaw with this argument is that neither the FLSA nor the pre-Glatt case law barred students from recovering wages, if they were indeed "employees" by function. That few cases had so allowed does not mean that organizations were free to treat students like uncompensated employees.

paid during their residency.  (Docs. ## 173-3, p. 10; 173-15, p. 10.)  There is also evidence that, in or around 2011, several Collier CRNAS "called the whistleblower hotline accusing [Collier] of doing something illegal." (Doc. #173-10, p. 76.)

The existence of these disputed material facts means "willfulness" is an issue for the jury to resolve.  This, in turn, renders summary judgment on the issue of liquidated damages similarly inappropriate.  See Alvarez Perez, 515 F.3d at 1166 ("[I]n an FLSA case a jury's finding in deciding the limitations period question that the employer acted willfully precludes the court from finding that the employer acted in good faith when it decides the liquidated damages question.").  Moreover, contrary to the Wolford Defendants' claim that liquidated damages "must be denied" in this case, whether to deny such an award pursuant to the FLSA's "good faith" exception is a decision resting wholly within the court's "sound discretion."  29 U.S.C. § 260.

The "touchstone" in determining whether an internship program crossed the line separating students from employees "is the 'economic reality of the relationship.'"  Glatt, 811 F.3d at 527.  Though the Glatt factors structure this analysis, it remains a flexible one for which courts should not elevate form over substance.  The overarching question on summary judgment is whether, after consideration of the seven Glatt factors and others relevant to the specific case, the court is convinced there exists no genuine issue of material fact bearing on whether the

internship i) provided students with a sound education and ii) exploited the students' free labor.

Here, the Court has identified numerous disputed issues of material fact that prevent a finding, as a matter of law, on this question. Because it is possible, but not certain, that Defendants implemented the SRNA internship program in a way that at least sometimes took unfair advantage of the students and short-changed their education, the Court denies the parties' supplemental motions for summary judgment.

Accordingly, it is hereby

**ORDERED:**

1.   Defendant Collier Anesthesia, P.A.'s Supplemental Motion for Final Summary Judgment (Doc. #248) is **DENIED.**

2.   Defendants Wolford College, LLC, Thomas L. Cook, and Lynda M. Waterhouses' Supplemental Dispositive Motion for Summary Judgment (Doc. #249) is **DENIED.**

3.   Plaintiffs' Supplemental Motion for Partial Summary Judgment (Doc. #251) is **DENIED.**

**DONE and ORDERED** at Fort Myers, Florida, this 27th day of October, 2016.

JOHN E. STEELE
SENIOR UNITED STATES DISTRICT JUDGE

Copies:
Counsel of Record